DELBELLO DONNELLAN                              Hearing Date: October 21, 2015
WEINGARTEN WISE & WIEDERKEHR, LLP              Hearing Time: 3:00 p.m.
*Attorneys for the Debtor*
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
(914) 681-0200
Jonathan S. Pasternak, Esq.
Erica Feynman Aisner, Esq.
Julie Cvek Curley, Esq.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:

BROOKLYN RENAISSANCE, LLC,                         Chapter 11
                                                    Case No. 15-43122 (CEC)
                          Debtor.
----------------------------------------------------------------X

**DEBTOR'S MOTION SEEKING ENTRY OF: (I) A SALE PROCEDURES
ORDER (A) APPROVING BIDDING PROCEDURES, (B) APPROVING A
BREAK-UP FEE; (C) SCHEDULING AN AUCTION AND SALE HEARING
AND (II) SALE APPROVAL ORDER (A) AUTHORIZING THE SALE OF
CERTAIN OF THE DEBTOR'S PROPERTY FREE AND CLEAR OF
ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B)
<u>GRANTING EACH SUCCESSFUL BIDDER GOOD FAITH STATUS</u>**

TO:    **THE HONORABLE CARLA E. CRAIG,
       CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Brooklyn Renaissance, LLC, the above captioned debtor and debtor-in-possession

("Debtor"), by its attorneys, DelBello Donnellan Weingarten Wise & Wiederkehr, LLP, hereby files

this motion ("Motion") pursuant to sections 105(a), 363(b), (f) and (m), 503, 507, 1146(a) of title 11

of the United States Code, 11 U.S.C. §§ 101, et seq., as amended by the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005 (the "Bankruptcy Code"), Rules 2002(a)(2),

6004(a), (b), (c), (e), (f) and (g), 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and Rules 2014-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the Eastern of New York (the "Local Rules") and Administrative Order No. 557 for the United States Bankruptcy Court for the Eastern District of New York, for entry of two Orders:

- **Sale Procedures Order** (substantially in the form annexed hereto as **Exhibit A**): (i) establishing bidding procedures, annexed hereto as **Exhibit B** to govern the sale (the "Sale") of the following real property:

    o    The Purchase and Sale Agreement ("84 Clinton Contract")(a copy of which is annexed hereto as **Exhibit C**) between the Debtor and MGJR Nominee LLC ("84 Clinton Buyer"), dated August 10, 2015, for the purchase of the real property located at 84 Clinton Avenue, Brooklyn, New York 11205 ("84 Clinton"),

    o    The Purchase and Sale Agreement ("300 VB Contract")(a copy of which is annexed hereto as **Exhibit D**) between the Debtor and The Other Half ("300 VB Buyer"), dated August 8, 2015, for the purchase of the real property located at 300 Van Brunt Street, Brooklyn, New York 11231 ("300 VB");  and

    o    The Purchase and Sale Agreement ("555-557 Union Contract")(a copy of which is annexed hereto as **Exhibit E**) between the Debtor and JJC Real Estate LLC (the "555-557 Buyer"), dated August 30, 2015, for the purchase of the real property located at 555-557 Union Street, Brooklyn, New York 11215 ("555-557 Union") [1].

(ii) scheduling an auction to sell the Properties, subject to higher and better bids (the "Auction"); (iii) scheduling a hearing to approve the sale of the Properties in accordance with the Auction (the "Sale Hearing"); and (iv) approving a break-up fee.

- **Sale Approval Order** (i) approving the sale of the Debtor's Properties in accordance with the results of the Auction to the highest bidder(s) (the "Successful Bidders"); (ii) authorizing the payment of a break-up fee, if the respective Purchaser is not the successful bidder at

---

[1] The 84 Clinton Contract, 300 VB Contract and 555-557 Union Contract are collectively referred to the "PSAs", 84 Clinton, 300 VB and 555-557 Union are collectively referred to the "Properties" and the 84 Clinton Buyer, 300 VB Buyer and 555-557 Buyer are collectively referred to as "Purchasers".

Auction; and (iii) granting the Successful Bidder good faith status. [2]

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Application is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This proceeding has been initiated pursuant to Bankruptcy Code §§ 105(a), 363(b), (f) and (m), 503, 507, 1146(a), Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (g), 6006(a) and 9(c), 9007 and 9014, and Local Rules 2014-1, 6004-1 and 6006-1.

## BACKGROUND

4.      On or about June 6, 2015 (the "Filing Date"), the Debtor filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Code").

5.      The Debtor has continued in possession of its property and the management of its business affairs as a debtor-in-possession pursuant to §§1107 and 1108 of the Code.

6.      The Debtor is the holder of legal and/or equitable interests in various parcels of real property located in Kings, New York and Suffolk County, New York (the "Assets").

7.      For the most part, the Assets have been conveyed numerous times to and from the Debtor, its affiliates and various insiders for no consideration. Many of the Assets are currently deeded to affiliates and insiders of the Debtor because, although conveyances to the Debtor may have occurred prior to the Filing Date, in certain instances such conveyances were not recorded.

---

[2] A proposed form of Sale Approval Order will be filed with the Court no less than ten (10) days prior to a sale approval/confirmation hearing after completion of the auction process proposed herein.

8.      Each of the Properties are subject to various mortgages and liens, some of which the Debtor disputes and all of which are in default.

9.      The Debtor intends to effectuate and/ or complete the conveyances of the Assets to the Debtor, resolve all outstanding disputes with the holders of liens thereon and liquidate them in order to pay legitimate creditors on their allowed claims in accordance with both state and federal law.

**The Debtor's Marketing Efforts**

10.      Beginning in February of 2015, the Assets were marketed heavily by an affiliate of the Debtor together with several other non-Debtor properties. The marketing campaign included advertisements for one month in New York Times as well as the New York Law Journal. In addition, conspicuous FOR SALE signs were posted at all properties.

11.      Numerous local real estate brokers were invited to participate in the auction process. Property descriptions and terms of sale were distributed to all interested parties.

12.      Over 400 public inquiries were received in response to the marketing campaign. There were also in excess of 40 inquiries received from real estate brokers.

13.      On March 27, 2015 after extensive marketing, an auction was held at the Brooklyn Marriot. Unfortunately, despite the excellent response received, the auction did not result in the anticipated sale prices, as the minimum prices were not met. The Debtor believes that this may have been attributable to certain terms which may have had the result of chilling bidding, including but not necessarily limited to the seller's retention of a right to cancel the contract of sale.

14.      The foregoing notwithstanding, the "buzz" over the sale of the Assets has continued. The Debtor's principal continues to receive inquiries by parties who have expressed

interest in purchasing the Properties.  It is these inquiries which resulted in the sale of the

Properties for which authority is sought herein.

### The Properties and Current State of Title

*84 Clinton Avenue, Brooklyn, New York*

   *15.*     84 Clinton is five (5) story building with four (4) residential apartments on a

historic block in the Clinton Hill area of Brooklyn. The property also has an English basement

with 8 foot ceilings. The property is currently vacant and is in a severe state of disrepair. It is

boarded up and in need of a complete rehabilitation, including repairs to the structure itself.

*300 Van Brunt Street, Brooklyn, New York*

   16.     300 Van Brunt is a 3-story mixed use property with a commercial unit on the first

floor and two residential units on the floors above. The property is located in the Red Hook

section of Brooklyn. There was rehabilitation work that was underway but not completed at the

property, such that the interior still needs completion work.

   17.     On September 3, 2008, 300 Van Brunt was deeded from Brooklyn Heritage, LLC,

an affiliate of the Debtor, to Annabelle McGown, a minor ("Annabelle") for no consideration.

However, this conveyance was subject to the right of the Debtor to purchase the property from the

owner for $100,000 (the "Option") which shall be paid in connection with the sale.

   18.     A petition for guardianship has been submitted by Annabelle's natural parents

James McGown and Amy Hicks. Once an Order from the Kings County Surrogates Court is

issued, the appointed guardian (Mr. McGown and/ or Ms. Hicks) intends to convey 300 Van

Brunt to the Debtor, pursuant to the Option.

   19.     In or about October, 2005, Brooklyn Heritage executed a mortgage in favor of

Park Avenue Bank in the principal amount of $1,200,000 and the related mortgage loan provided

for a maturity date of November 1, 2006.

20.     Currently, 300 Van Brunt is subject to a disputed mortgage held by Hamilton Van Brunt LLC ("Hamilton VB") as alleged assignee of CSE Mortgage, LLC.[3] Hamilton VB alleges that there is in excess of $3,400,000 due and owing in connection with the mortgage on 300 Van Brunt. However, the Debtor disputes Hamilton Van Brunt's lien and has commenced an adversary proceeding (EDNY Adv. Pro. Case No. 15-1086-cec) seeking to declare the mortgage cancelled and expunging the lien on the property. This adversary proceeding is currently pending.

***555 Union Street, Brooklyn, New York***

21.     555 Union is a four family walk-up building which is located in the Gowanus section of Brooklyn. The property is currently vacant.

22.     On April 3, 2014, the Debtor acquired title to 555 Union in 2014 from The Cherry Tree Corp, an affiliate of the Debtor, for no consideration. The Cherry Tree acquired title to the property on October 3, 2008 from 555 Owners I Corp, an affiliate of the Debtor, for no consideration. 555 Owners I Corp. acquired title to the property from George McGown, Mr. McGown's father, on March 20, 2007 for no consideration.

23.     555 Union is subject to a disputed first mortgage lien held by FIA Union Holding LLC ("FIA 555") who alleges that it is the assignee of LZG Realty LLC. FIA alleges that there is a balance due in the amount of approximately $1.375 million.

24.     555 Union is also subject to a judgment lien held by Anthony Salzano in the original principal amount of $140,500. As of the filing date, Salzano alleged that he was owed $222,919.46.  The Debtor believes the actual amount owed is approximately $210,000.

---

[3] CSE Mortgage, LLC alleges that it was assigned the note and mortgage on 300 Van Brunt from PAF Capital, LLC as the alleged assignee of Park Avenue Bank, the original mortgagee.

*557 Union Street, Brooklyn, New York*

25.    557 Union is a four family walk-up building which is located in the Gowanus

section of Brooklyn. The property is currently vacant.

26.    On July 6, 2015, 557 Union was conveyed to the Debtor by the prior owner and

the Debtor's affiliate, Brooklyn Theatrical LLC, for no consideration. James McGown executed

the deed on behalf of the principal of Brooklyn Theatrical LLC,

27.    The deed from Brooklyn Theatrical LLC to the Debtor has not been and cannot be

recorded because the deed is not acknowledged. Mr. McGown was out of the country at the time

of execution and he did not have access to a notary. Mr. McGown has agreed to execute a

corrective deed which will be recorded prior to the proposed sale of the property herein (subject

of course to Bankruptcy Court approval).

28.    557 Union is subject to a mortgage lien held by Maspeth Savings Bank

("Maspeth") and the approximate amount due under the related mortgage note is $2.3 million.

However, Maspeth has agreed to a discounted payoff in the approximate amount of $2.06 million

in connection with this sale. Maspeth also holds a mortgage lien on a non-debtor property located

at 85 Luquer Street, Brooklyn, New York which serves as additional collateral for this obligation.

## The Purchase and Sale Agreements

29.    After arms-length negotiations, the Debtor and the Purchasers executed the PSAs.

A copy of the PSAs are attached hereto as **Exhibit C, D, and E,** respectively**.**  Subject to this

Court's approval of higher and/or better offers through an auction process, the Debtor seeks

approval to sell the Properties (as defined in the PSAs[4]).

---

[4] The following summary is qualified entirely by the terms of the PSAs.  To the extent there are any inconsistencies
between the description of the PSAs contained herein and the terms and conditions of the PSAs, the terms of the
PSA shall control.

30.    The PSAs all provide for a sale of the Properties to three distinct non-insider arms-length parties, free and clear of all liens, claims, encumbrances and interests of any kind (including without limitation those of all federal, State and local taxing authorities), subject to higher and better offers. All three (3) proposed sales are all cash and not subject to any financing or due diligence contingencies. They all provide for a sale of the Properties AS-IS and subject to all violations but provide that the Debtor shall pay all monetary fines associated therewith.

31.    The following is a summary of the material terms and conditions of the three (3) PSAs:

## A. The 84 Clinton Contract

| | |
|---|---|
| **Seller** | Brooklyn Renaissance |
| **Purchaser** | MGJP Nominee LLC or its assigns |
| **Purchase Price** | $2,500,000 |
| **Deposit** | $125,000, payable upon execution of the PSA (currently held in Debtor's counsel's escrow account) |
| **Closing Date** | The closing shall take place within forty-five (45) days following the later to occur of (i) entry of a final and non-appealable Sale Approval Order or (ii) entry of an Order confirming the Debtor's Chapter 11 Plan. |
| **Closing Deadline** | Notwithstanding anything set forth in the 84 Clinton PSA to the contrary, in the event that the Closing does not occur within one hundred eighty (180) days from the date of the Contract August 10, 2015 which event is not solely due to an act or omission of the Purchaser, Purchaser may elect, at any time thereafter, to terminate the contract. |

## B. The 300 Van Brunt Contract

| | |
|---|---|
| **Seller** | Brooklyn Renaissance |
| **Purchaser** | The Other Half LLC |

| | |
|---|---|
| **Purchase Price** | $1,800,000.00 |
| **Deposit** | $180,000; $90,000 payable upon execution of the PSA (currently held in Debtor's counsel's escrow account) and $90,000 payable within two (2) business days of the earlier of, entry of a Sale Approval Order or an Order approving the Debtor's Chapter 11 Plan. |
| **Closing Date** | The closing shall take place on or about ten (10) business days following the later to occur of (i) entry of a final and non-appealable Sale Approval Order or (ii) entry of an Order confirming the Debtor's Chapter 11 Plan. |
| **Broker** | All commissions and/ or fees due to the real estate broker, Realty Collective LLC shall be borne by the Purchaser. |

### C. The 555-557 Union Street Contract

| | |
|---|---|
| **Seller** | Brooklyn Renaissance |
| **Purchaser** | JCC Real Estate LLC |
| **Purchase Price** | $3,800,000.00 |
| **Deposit** | $380,000 payable upon execution of the PSA (currently held in Debtor's counsel's escrow account |
| **Closing Date** | The closing shall take place within forty-five (45) days of the later to occur of (i) entry of a final and non-appealable Sale Approval Order or (ii) entry of an Order confirming the Debtor's Chapter 11 Plan. |

## RELIEF REQUESTED

32.    By this motion, the Debtor is seeking entry of a Sale Procedures Order and, after completion of an auction process, a Sale Approval Order. A proposed Sale Procedures Order is Annexed hereto as **Exhibit "A"**.

## BASIS FOR RELIEF

I.    **The Sale Procedures Order**

     A. **The Proposed Bidding Procedures**

33.    The Sale of the Properties pursuant to the PSAs is subject to higher and/or better

offers. In order to ensure that the highest and best offer is received for the Properties, the Debtor has established the proposed Bidding Procedures to govern the submission of competing bids at an auction. Accordingly, the Debtor seeks this Court's approval of the Bidding Procedures set forth in **Exhibit "B"** and incorporated herein in their entirety.

34.    As part of the Bidding Procedures, the Debtor seeks approval of the Break-Up Fees provided for in each PSA; $100,000 pursuant to the 84 Clinton PSA; $25,000 pursuant to the 300 Van Brunt PSA; and $54,000 pursuant to the 555-557 Union PSA (collectively, the "Break-Up Fees"). The Break-Up Fees are inclusive and comprised of an expense reimbursement in favor of the respective Purchasers which represent 4%, 1.39% and 1.42% respectively, of the Purchase Price under the PSAs. The Break-Up Fees are payable upon the Debtor consummating any sale, transfer, or other disposition of the respective Property to any person or entity other than the Purchaser provided for under the respective PSA (an "Alternative Transaction").

35.    In addition, the Bidding Procedures provide that the bidding increments be $25,000 and that bidders submit initial overbids in an amount no less than the respective Break-Up fee plus $25,000 ("Initial Overbid").

36.    All bids submitted for the purchase of the Debtor's Properties shall remain open, and shall be returned within three (3) business days to each bidder following the Sale Approval Hearing. However, the Debtor shall retain the deposit for the second highest bidder on each Property (the "Back-Up Bidder") in connection with each Property until such time as the sale closes. In the event that the sale is not approved by the Bankruptcy Court and/ or does not close, the Debtor shall proceed to close with the Back-Up Bidder.

## B. <u>Bidder Qualification</u>

37.    In order for a potential purchaser of a Property to qualify as a Bidder, the Debtor proposes that the purchaser's Competing Bid must be received by November 13, 2015 at 12:00 p.m. (the "Bid Deadline"), however, the Debtor reserves the right to extend the Bid Deadline up to 9:00 a.m. on the day of the Auction.  To be considered a Qualified Competing Bid, each Competing Bid must comply with all of the following requirements:

(a)    it is in writing, designates which Property or Properties to which the bid relates and is irrevocable through a closing of the sale of the respective Property;

(b)    it includes a duly authorized and executed purchase and sale agreement, substantially in the form of the applicable PSA, as well as copies of such materials marked to show any amendments and modifications to the applicable PSA (the "Marked Agreement") and a marked copy of the proposed order to approve the Sale by the Bankruptcy Court;

(c)    it provides for a cash purchase price for the Property in an amount not less than the respective Initial Overbid;

(d)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Debtor to make a reasonable determination as to the Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement;

(e)    it is not conditioned on any contingencies, such as, without limitation: (i) the outcome of unperformed due diligence by the Bidder, and/or (ii) obtaining financing;

(f)    it includes an acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all required diligence regarding the Property prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Property or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreement; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(g)  if such bidder is not an individual, it includes a representation and/ or evidence, in form and substance reasonably satisfactory to the Debtor, of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Marked Agreement; and

(h)  it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Seller), certified check or such other form acceptable to the Seller, payable to the order of the Seller (or such other party as the Seller may determine) in an amount not less than 10% of the Competing Bid.

For the avoidance of doubt, and notwithstanding the foregoing, any overbid submitted by the Purchaser at any Auction on substantially the same terms as its initial offer (apart from any increase in price) shall be a Qualified Competing Bid.

38.    The Debtor believes that these proposed Bidding Procedures are fair and reasonable and will permit all parties truly interested in acquiring one or more of the Properties, an opportunity to submit a bid that can be weighed or compared against the Debtor's stalking horse offers.

**C. The Proposed Bidding Procedures Are Adequate and Should Be Approved**

39.    In determining whether bidding procedures governing the sale of a debtor's Property are adequate, Court have consistently deferred to the debtor's business judgment for their specific industry. See, In re Integrated Resources, Inc., 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992)(holding that where overbid procedures are negotiated by the chapter 11 debtor, the business judgment rule applies and said procedures are "presumptively valid").

40.    Furthermore, the purpose of bidding procedures is to solicit the highest and best bid, which would in turn best benefit the creditors. In re Financial News Network Inc., 980 F.2d 165 (2nd. Cir., 1992)(stating that the bankruptcy court's principal responsibility relating to bidding procedures that govern sale is to secure best possible bid for benefit of creditors).

12

41.     Thus, courts deem appropriate those bidding procedures intended to maximize the value of the debtor's estate. See, e.g., Financial News, 980 F.2d at 170-71 (allowing bidder to supplement one of two bids for Chapter 11 debtor's Property after bidding was closed since the revision was consistent with both rules by which particular auction was being conducted and reasonable expectations of bidders); Integrated Resources, 147 B.R. at 656-57.

42.     The Debtor believes that the Bidding Procedures proposed will additionally procure serious parties interested in acquiring the Property and will result in realizing the full value of the Property. The Debtor's Bidding Procedures are designed to facilitate a competitive bidding process in an expeditious manner. The Bidding Procedures will allow the Debtor to conduct the Auction in an open fashion that will encourage participation from those bidders that demonstrate they are financially capable to consummate the transaction.

43.     The Initial Overbid is necessary not only to compensate the Debtor for the risk that it assumes in foregoing a known, willing and able purchaser for a new potential acquirer, and additionally to ensure that there is an increase in the net proceeds to the estate, after payment of the Break-Up Fee.  The Debtor believes that the Initial Minimum Overbid will enable competitive bidding and maximize the value of the Properties, without a chilling effect.

44.     The Debtor believes, in its business judgment that the Bidding Procedures are adequate and will result in maximizing the value of the Properties and are therefore appropriate under the relevant standards governing auction proceedings.

### D.  **The Proposed Break-Up Fees are Appropriate**

45.     Is has become an established practice in chapter 11 cases to permit and approve break-up fees and other forms of bidding procedures in connection with the sale of significant property pursuant to section 363 of the Bankruptcy Code. See, e.g., Integrated Resources, 147

B.R. at 662; In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24 (Bankr. S.D.N.Y. 1989). Break-up fees enhance the bidding process by inducing a "white knight" to submit a bid by providing compensation for the risks it is undertaking and to cover the costs of due diligence. 995 Fifth Ave. Assoc., 96 B.R. at 28.

46.     Generally, Courts approve break-up fees unless they are unreasonable or appear more likely to chill the bidding process than to enhance it. Integrated Resources, 147 B.R. at 662. When examining whether break-up fees are reasonable and appropriate, the Courts examine (1) the relationship between the parties negotiating the break-up fee for any self-dealing or taint; (2) whether the fee hampers, as oppose to enhances, bidding; and (3) whether the amount of the break-up fee is unreasonable as compared to the purchase price. Id.

47.     The Break-Up Fees in this instance are appropriate since (1) the Debtor and the Purchasers negotiated at arms- length through both separate professional advisors and counsel, (2) the Break-Up Fees provide an incentive for the Purchasers to enter into the PSAs and invest significant monies and efforts in conducting its due diligence and engaging legal counsel to negotiate the PSA, all the while not knowing whether it will be the Successful Bidder, and (3) the maximum aggregate amount of the Break-Up Fees are reasonable – 4%, 1.39 and 1.42% of the respective Purchase Price. These amounts are substantially less than break-up fees approved in other cases. See, e.g., Financial News, 98 F.2d at 167 (approving $8.2 million, or **5.5%** break up fee on a $149.3 million sale); LTV Aerospace and Defense Co. v. Thomson-CSF, S.A. (In re Chateaugay Corp.), 198 B.R. 848, 861 (Bankr. S.D.N.Y. 1996)(approving $20 million, or **4.4%** break-up fee on $450 million offer); Integrated Resources, 147 B.R. at 662 (approving break up fee representing **3.2%** of bidders expenses, or **1.6%** of the purchase price). Compare, In re Twenver, Inc., 149 B.R. 954, 956 (Bankr. D.Colo. 1992)(denying break-up fee of **10%** of bid).

48.      In addition to the factors stated above, the Break-Up Fees will provide a minimum floor bid on which other bidders may rely upon.  The Purchasers have stated that they will not provide the deposit or move forward as the stalking horse buyer absent approval of the Break-Up Fees  Therefore, under the circumstances, the Break-Up Fees are both reasonable and appropriate.

### E. The Proposed Form and Manner of Notice of Sale is Adequate

49.      Bankruptcy Rule 2002(a) and (c) requires the Debtor to notify creditors of the proposed sale of the Property, including the date, time and place of the Auction, terms of the Sale, and the deadline for filing any objections. The Debtor intends to comply with these rules by serving, via first class mail, this Motion on all creditors as well as all parties having filed Notices of Appearance and the Office of the United States Trustee.

50.      The Debtor intends to serve notice of the Auction and Bidding Procedures on all parties who have expressed interest in purchasing the Properties over the last eighteen (18) months and any other parties who the Debtor believes may be interested in purchasing the Properties. The Debtor also proposes to advertise the Auction in the New York Law Journal and to post large and conspicuous signage on each property for no less than two weeks prior to the Auction. .

51.      The Debtor submits that the foregoing notice fully complies with the requirements set forth in Bankruptcy Rule 2002 and 6004. Based upon the foregoing, the Debtor respectfully request that this Court approve the form and manner of the notice proposed above.

### F.  The Auction

52.      If the Seller receives one or more Qualified Competing Bids in addition to the PSAs, the Seller will conduct the Auction to select the highest or best bid for the Properties (the "Successful Bid").  The Auction, which shall be transcribed or recorded to the extent required

under New York local practice, shall be held at 10:00 a.m. (prevailing Eastern time) on

November 17, 2015, at the offices of at the offices of Debtor's counsel, DelBello, Donnellan

Weingarten Wise & Wiederkehr, LLP, One North Lexington Avenue, White Plains, New York

10601, or such other location designated by the Debtor and timely communicated to all entities

entitled to attend the Auction.

53.     The Seller will conduct the Auction in any manner and upon any terms and

conditions satisfactory to the Court, permitted by the PSAs, and consistent with the Bidding

Procedures, that will achieve the maximum value for the Properties.  Such terms and conditions

may include, by way of example, one or more rounds of sealed or open bids from the Purchasers

and any Bidder who submitted a Qualified Competing Bid.  The initial bids at the Auction shall

be the highest or otherwise best bid, as determined by the Debtor in its reasonable discretion, as

among the Purchasers' bids and any Qualified Competing Bids, and such initial bid shall be

announced to the Purchasers and any other Bidder submitting a Qualifying Competing Bid at the

commencement of the Auction.

54.     At the conclusion of the Auction, the Debtor shall submit the Successful Bids to

the Court at the Sale Hearing, for entry of a Sale Approval Order.  Any Bid that fails to comply

with the Bidding Procedures or any other procedures established at the Auction may be refused.

55.     If no Qualified Competing Bids are received, the Debtor and the Purchasers

intend to seek immediate Court approval of the PSAs without conducting an Auction.

56.     Prior to the conclusion of the Auction, the Debtor will (a) review and evaluate the

Purchasers' bids and each Qualified Competing Bid, (b) identify the highest or otherwise best

offer for the Properties received at the Auction (such bid, the "Successful Bid" and the bidder

making such bid, the "Successful Bidder") and (c) communicate to the Purchasers and the

Qualified Competing Bidders the identity of the Successful Bidder and the details of the Successful Bid.  The determination of the Successful Bid by the Purchasers shall be final, subject to approval by the Court.

57.     The Debtor will sell the Properties to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Court at the Sale Hearing.

58.     If, following the entry of the Sale Approval Order, the Successful Bidder fails to consummate the Sale because of a breach or failure to perform on the part of the Successful Bidder, the Back-Up Bid for such Property will be deemed the new Successful Bid, and the Debtor will be authorized, but not required, to consummate the Sale with the bidder who submitted the Back-Up Bid without further order of the Court.  In such case, the good faith deposit of the Successful Bidder shall be forfeited to the Debtor and the Debtor shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder to the extent permissible under the applicable purchase agreement and applicable law.

**II.     The Sale Approval Order**

**A.     This Court Should Approve the Sale of the Debtor's Properties to the Successful Bidder**

59.     As set forth above, the Debtor entered into the PSAs with the Purchasers which provides for a sale of three of the Properties pursuant to the terms set forth herein and in each PSA.

60.      Following the Auction, the Debtor will seek this Court's approval of the sale of the Debtor's Properties free and clear of all liens, claims, interests and encumbrances to the respective Successful Bidder.

61.    The Debtor shall pay at closing all customary title costs, fines associated with each Property and all non-disputed liens on each Property. All of the remaining sale proceeds will be held in escrow by Debtor's counsel, with all liens, claims, interests and encumbrances, if any, to attach to the proceeds in accordance with Section 363(f) of the Bankruptcy Code, pending further Order of the Court.

62.    Pursuant to Section 363 (b) and (f) of the Bankruptcy Code, the Debtor seeks entry of an order authorizing the sale and transfer the Properties. Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, "The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  §363 (f) of the Code states as follows:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute;  or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

63.    The conditions set forth in 11 U.S.C. §363(f) are in the disjunctive, which means that only one of the tests must be met. The Debtor believes that the purchase prices for the sale of the Properties represent fair consideration and moving forward with the sales as proposed herein is in the best interests of the estate and its creditor. The Debtor believes that an immediate sale of

the Properties is best as it stops the accrual of all administrative costs associated with carrying the Properties (insurance, taxes, etc.) but also brings into the estate a significant sum which can be used to pay creditors. Moreover, the Purchase Price is adequate and represents fair market value of the Properties to be sold and the sale proceeds will be used to fund a liquidating plan of reorganization.

64.    Moreover, the secured claims asserted against the 300 Van Brunt and 555 Union property are in material dispute.  As to 84 Clinton, there is sufficient equity in the property to pay all secured claims in full.

65.    It is therefore submitted that Section 363(f) is fully satisfied and an immediate sale of the Property is in the best interests of creditors and the estate and will prevent unnecessary, irreparable harm to the creditors and the estate.

66.    In connection with this motion, the Debtor proposes to invite interested parties to make higher or better offers by way of conducting an auction of the Properties in contemplation of sales free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the sale proceeds.

67.    The Debtor seeks authority to conduct the Auction free and clear of all liens with the liens to attach to the proceeds of sale (i.e., gross proceeds, less expenses) pursuant to 11 U.S.C. §363(f). Since the Auction contemplated hereby is not in the ordinary course, its authorization requires notice and a hearing pursuant to Section 363(b) of the Code. Auction sales are specifically authorized under the Bankruptcy Code and F.R.B.P. Rule 6004(f) provides that, "All sales not in ordinary course of business may be by private sale or public auction."

68.    It is within the discretion of the Court to determine whether to approve or disapprove of a method for the disposition of property.  In re Alves, 52 B.R. 353 (Bankr. D.R.I.

1985); See, generally, In re Stogsdill, 102 B.R. 587 (Bankr. W.D. Tex. 1989). As stated above, the Property constitutes substantially all of the Debtor's assets.

69.     The Debtor respectfully submits that the PSAs, subject to higher and better offers received at an Auction, will provide the greatest recovery for the Debtor's estate than would be provided by any other available alternative. In addition, the terms and conditions of the PSAs will be tested in the market through an auction process, which will support the fairness and reasonableness of the consideration being received. Therefore, the Debtor requests that the Court authorize and approve the Sale of the Properties.

**B.       Protections as a Good Faith Purchaser**

70.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under Section 363(b) is later reversed or modified on appeal.  *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

71.     The selection of the Purchasers and/or Successful Bidders have been or will be the product of an arm's-length, good-faith negotiation in a competitive purchasing process. Based on the record to be made at the Sale Hearing, the Debtor will request a finding that the Successful Bidders are good-faith purchasers entitled to the protections of Section 363(m) of the Bankruptcy Code.

## NOTICE

72.     Notice of this Motion has been provided to (i) the Office of the U.S. Trustee; (ii) all creditors; (iii) all taxing authorities; (iv) counsel to the Purchasers; (vi) all entities known or

reasonably believed to have asserted a lien, claim, interest, or encumbrance in any of the Property, (v) all potential buyers known by the Debtor as having previously expressed interest in acquiring any of the Property, and (vi) all parties that have requested notice pursuant to Bankruptcy Rule 2002. The Debtor submits that said notice is adequate and proper.

## NO PRIOR REQUEST

73.    No prior Motion for the relief requested herein has been made to this or any other Court.

## CONCLUSION

74.    For all of the foregoing reasons, the Debtor respectfully requests entry of (i) the Sale Procedures Order, substantially in the form annexed hereto as Exhibit A, (ii) after the Auction and a Sale Hearing, entry of the Sale Approval Order, substantially in the form annexed hereto as Exhibit D.

**WHEREFORE,** the Debtor respectfully requests that the Court grant all of the relief requested herein, together with such other and further relief as is just and proper under the circumstances.

Dated:  White Plains, New York
        September 25, 2015          DELBELLO DONNELLAN WEINGARTEN
                                     WISE & WIEDERKEHR, LLP
                                     *Attorneys for the Debtor*
                                     One North Lexington Avenue
                                     White Plains, New York 10601
                                     (914) 681-0200

                                     By: _____/s/_____
                                          Jonathan S. Pasternak
                                          Erica Feynman Aisner