# EXHIBIT "C"

*Execution Copy*

# PURCHASE AND SALE AGREEMENT

*555-557 Union Street*
*Brooklyn, New York 11215*
*Section _____, Block 433, Lots 56 and 57*

## ARTICLE 1: PROPERTY PURCHASE AND SALE

1.1 <u>Certain Basic Terms</u>.

| (a) <u>Purchaser and Notice Address</u>:<br><br>JCC Real Estate LLC<br>c/o Diane Chan, Esq.<br>Chan & Associates PLLC<br>39-07 Prince Street, Suite 3K<br>Flushing, New York 11354<br>Telephone: (718) 886-0663<br>Facsimile: (718) 886-5615<br>E-mail: dianechan888@gmail.com | <u>With a copy to</u>:<br><br>Diane Chan, Esq.<br>Chan & Associates PLLC<br>39-07 Prince Street, Suite 3K<br>Flushing, New York 11354<br>Telephone: (718) 886-0663<br>Facsimile: (718) 886-5615<br>E-mail: dianechan888@gmail.com |
|---|---|
| (b) <u>Seller and Notice Address</u>:<br><br>Brooklyn Renaissance LLC<br>320 Court Street, 3rd Floor<br>Brooklyn, New York 11231<br>Attn: James McGown<br>Telephone: (____) _____<br>Email: _____ | <u>With a copy to</u>:<br>DelBello Donnellan Weingarten<br>Wise & Wiederkehr, LLP<br>One North Lexington Avenue<br>White Plains, New York 10601<br>Attention:   Jonathan S. Pasternak, Esq.<br>               jsp@ddw-law.com<br>               Erica Feynman Aisner, Esq.<br>               eaisner@ddw-law.com<br>Telephone: (914) 681-0200 |
| (c) Broker:<br><br>None. | (d) Escrow Agent:<br><br>DelBello Donnellan Weingarten Wise &<br>Wiederkehr, LLP<br>One North Lexington Avenue<br>White Plains, New York 10601<br>Attn: Jonathan S. Pasternak, Esq.<br>Telephone: (914) 681-0200<br>Email: jsp@ddw-law.com |

*Execution Copy*

(e)         Date of this Agreement:     The latest date of execution of this Purchase and Sale Agreement by the Seller, or the Purchaser, as indicated on the signature page (the "Effective Date").

(f)         Purchase Price:         $3,800,000.00

(g)         Purchaser's Deposit: A $380,000.00 refundable initial deposit (the "Initial Deposit") shall be delivered to Escrow Agent upon execution of this Purchase and Sale Agreement (the "Deposit") and shall become non-refundable upon approval of the Bankruptcy Court, and except as otherwise provided herein, either applied to the Purchase Price at Closing or retained by Seller if Purchaser defaults hereunder, except that the Deposit shall be refunded in the event of (i) Seller default or (ii) an Alternative Transaction (as that term is defined herein) in accordance with provisions relating to such events further detailed herein.

(h)         Closing Date: The closing shall take place within 45 days of the later to occur of entry of a final and non-appealable (i) Order confirming the Seller's Liquidating Chapter 11 Plan (the "Confirmation Order") or (ii) Approval Order (as defined Section 5.2.3 herein). Seller shall have the right, but not the obligation, to close prior to entry of a Confirmation Order, provided that notice of such election is given no sooner than 45 business days prior to such closing. The foregoing notwithstanding, Purchaser shall have the right to terminate this Agreement in the event that Seller is unable to close within 180 days after the Effective Date, provided that such inability to close is due in no part to the actions or inactions of Purchaser.

        1.2     Property. Subject to the terms and conditions of this Purchase and Sale Agreement (the "Agreement"), Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, all of Seller's right, title and interest in and to the following property (collectively, the "Property"), free and clear of all liens, claims, encumbrances and interests of any kind (including, without limitation, those of all federal, State and local taxing authorities):

        (a)     The "Real Property", being the land described in Exhibit A attached hereto, together with (i) all improvements located thereon ("Improvements"), (ii) all or singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in any way appertaining to such real property, and (iii) without warranty, all right, title, and interest of Seller in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such Real Property.

        (b)     The "Intangible Personal Property", being all intangible personal property related to the Real Property and the Improvements, including, without limitation: any architectural and engineering drawings for the Improvements (the "Plans"); warranties; contract rights related to the construction, operation, ownership or management of the Real Property (but only to the

*Execution Copy*

extent Seller's obligations thereunder are expressly assumed by Purchaser pursuant to this Agreement); governmental permits, approvals and licenses (to the extent assignable).

(c) The parties hereby acknowledge that 557 Union Street (Lot 56) has been deeded by the prior owner, Brooklyn Theatrical to the Debtor however, such deed has not yet been recorded and will be recorded prior to the closing hereof.

1.3 "Excluded Property", being all (i) personal property belonging to third parties and (ii) personal property which is property of the Debtor's estate including but not necessarily limited to, (a) all causes of action, including, without limitation, Seller's estate causes of action under Section 542 through 553 of the Bankruptcy Code; (b) all books and records of Seller; (c) accounts receivable, if any; and (d) funds on hand and on deposit in banks.

1.4 Bankruptcy of Seller.

(a) Purchaser acknowledges and agrees that Seller has disclosed to Buyer that on July 6, 2015, Seller filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"), case number 15-43122(cec) (the "Bankruptcy Case").

(b) Purchaser further acknowledges and agrees that this Agreement is subject to (i) Bankruptcy Court approval and (ii) higher and better offers, to be sought in accordance with Article 9 hereof as approved by an order of the Bankruptcy Court (in a form reasonably acceptable to Buyer in form and substance) approving this contract, authorizing and approval bidding and sale procedures, which shall culminate in an auction sale (the "Auction").

## ARTICLE 2: CONDITION OF PROPERTY

2.1 AS IS, WHERE IS. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, PURCHASER EXPRESSLY ACKNOWLEDGES AND AGREES THAT, AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, THE PROPERTY IS BEING SOLD TO PURCHASER AND PURCHASER AGREES TO PURCHASE AND ACCEPT THE PROPERTY, AND EACH AND EVERY PART AND COMPONENT THEREOF, IN AN "AS IS, WHERE AS" CONDITION AS OF THE CLOSING WITH NO REPRESENTATIONS OR WARRANTIES FROM SELLER, INCLUDING BUT NOT LIMITED TO THE PHYSICAL, LEGAL OR TITLE CONDITION OF THE PROPERTY, EITHER EXPRESS OR IMPLIED EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT. PURCHASER AGREES THAT PURCHASER IS NOT RELYING UPON, AND HAS NOT RECEIVED OR BEEN GIVEN, ANY REPRESENTATIONS (EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT), STATEMENTS OR WARRANTIES (ORAL OR WRITTEN, IMPLIED OR EXPRESS) OF OR BY ANY OFFICER, EMPLOYEE, AGENT OR REPRESENTATIVE OF SELLER, OR ANY SALESPERSON OR BROKER (IF ANY) INVOLVED IN THIS TRANSACTION, AS TO THE PROPERTY OR ANY PART OR COMPONENT THEREOF IN ANY RESPECT.

*Execution Copy*

## ARTICLE 3: TITLE AND SURVEY REVIEW

3.1  Delivery of Title Commitment and Survey. Within thirty (30) days of the Contract Date, Purchaser shall obtain: (i) a current, effective commitment for title insurance (the "Title Commitment") from a reputable title company licensed to do business in the State of New York, in the amount of the Purchase Price with Purchaser as the proposed insured, and accompanied by true, complete, and legible copies of all documents referred to in the Title Commitment; and (ii) a current survey of the Property (the "Survey).

3.2  Title Review and Cure. Purchaser shall not be entitled to assert as an objection to title any matter as to which the Title Company shall insure the Purchaser without additional cost to Purchaser. The term "Permitted Exceptions" shall mean: the standard printed exclusions from coverage contained in the ALTA form of owners title policy currently in use in New York; all easements, conditions, restrictions, agreements and covenants of record provided that the same are not violated by the current use of the Real Property; any laws, regulations, statutes, ordinances, orders or other legal requirements affecting the Real Property, including without limitation, those relating to zoning and land use, provided the same are not violated by the current use of the Real Property; any utility company rights, easements and franchises for electricity, water, steam, gas, telephone or other service or the right to use and maintain poles, lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Real Property, provided that the same did not materially adversely affect the present use of the Real Property; any installment not yet due and payable as of the Closing Date of assessments imposed after the date hereof and affecting the Real Property or any portion thereof; items shown on the Survey not determined by Purchaser to be objectionable; real estate taxes not yet due and payable. Purchaser shall receive a credit for any accrued but unpaid general real estate taxes and assessments applicable to any period before the Closing Date, including, without limitation, any assessments that Seller has elected to pay in installments, even if such installment is not yet due and payable. Purchaser shall provide Seller with written notice of any objections to title, other than Permitted Exceptions, within ten (10) days of receipt of the Title Commitment and Searches; Seller's receipt of the title report shall be deemed sufficient notice.

3.3  Delivery of Title Policy at Closing. As a condition to Purchaser's obligation to close, its title company shall deliver to Purchaser at Closing a Standard 2006 ALTA Owner's Policy of Title Insurance with New York Endorsement (the "Title Policy"), as of the date and time of the recording of the Deed, in the amount of the Purchase Price, containing the Purchaser's Endorsements, insuring Purchaser as owner of good, marketable and indefeasible fee simple title to the Property, and subject only to the Permitted Exceptions. "Purchaser's Endorsements" shall mean, to the extent such endorsements are available under the laws of the state in which the Property is located: (a) owner's comprehensive; (b) access; (c) survey (accuracy of survey); (d) location (survey legal matches title legal); and (e) separate tax lot. At closing Seller shall execute a title/closing affidavit in form and substance reasonably acceptable to the Seller. The Title Policy may be delivered after the Closing if at the Closing the title company issues a currently effective, duly-executed "marked-up" Title Commitment and irrevocably commits in writing to issue the Title Policy in the form of the "marked-up" Title Commitment promptly after the Closing Date.

1138982_4
0142826-001

*Execution Copy*

3.4   Title and Survey Costs. The cost of the Survey, including any revisions necessary to make the Survey conform to the requirements of this Agreement, shall be paid by Purchaser. The premium for the Title Policy, including the premium for extended coverage and the Purchaser's Endorsements, shall be paid by Purchaser. The cost of the Searches shall be paid by Purchaser.

3.5   Violations and Fines. Notwithstanding anything to contrary set forth herein, the Purchaser shall take title to the Property subject to all violations of law or governmental ordinances, orders or requirements ("Prior Violations") which were noted or issued prior to the Effective Date; Seller shall be responsible for any and all violations arising after the Effective Date ("Future Violations"), but before the Closing. At or prior to the Closing, the Seller shall pay and discharge all monetary liens arising out of or relating to the Prior Violations and Future Violations in the full amount due as of the Closing. To the extent that the Prior Violations continue post-Closing, the Purchaser shall assume all responsibility for cure as well as any additional fines or monetary liens which may arise in thereafter.

## ARTICLE 4: OPERATIONS AND RISK OF LOSS

4.1   Ongoing Operations. During the pendency of this Agreement:

(a)   Property Operations Pending Closing. Until Closing, Seller shall (i) carry on its business and activities relating to the Property substantially in the same manner as it did before the date of this Agreement,, and (ii) shall continue to maintain insurance coverage on the Property.

(b)   Environmental Matters. Seller represents and covenants that, between the date of this Agreement and the Closing Date or the earlier termination of this Agreement: (a) it shall not expressly permit the use of the Property for the generation, manufacture, refinement, production, or processing of any asbestos-containing materials, hazardous substances or materials, and petroleum and petroleum-related derivatives and constituents (collectively, "Hazardous Materials") or for the storage, handling, transfer or transportation of any Hazardous Materials (other than in connection with the operation and maintenance of the Property and in commercially reasonable quantities by Seller or its tenants, as a consumer, dealer or retailer thereof and in compliance with any applicable Federal, state and local statutes, laws, ordinances, orders, rules and regulations relating to environmental, health and safety issues of every nature whatsoever ("Environmental Laws")); and (b) it shall not install or permit the installation on the Property of any underground storage tanks, surface impoundments or asbestos-containing materials. Seller further represents and covenants that it is not aware of, nor has it caused any environmental contamination or damage to the Property.

(c)   New Contracts. Seller will not enter into any contract that will be an obligation affecting the Property subsequent to the Closing without Purchaser's express consent. Seller represents that there are no existing contracts affecting the Property.

*Execution Copy*

4.2   <u>Damage</u>.  Risk of loss up to and including the Closing Date shall be borne by Seller. In the event of any material damage, <u>including environmental damage</u>, to or destruction of the Property or any portion thereof, Purchaser may, at its option, by notice to Seller given within 10 days after Seller notifies Purchaser of such damage or destruction (and if necessary the Closing Date shall be extended to give Purchaser the full 10-day period to make such election): (i) terminate this Agreement, in which case the Deposit will be immediately returned to Purchaser; or (ii) proceed under this Agreement, receive any insurance proceeds (including any rent loss insurance applicable to any period on and after the Closing Date) due Seller as a result of such damage or destruction and assume responsibility for such repair, and Purchaser shall receive a credit at Closing for any deductible, uninsured or coinsured amount under said insurance policies. If Purchaser elects (ii) above, Purchaser may extend the Closing Date for up to an additional thirty (30) day period in which to obtain insurance settlement agreements with Seller's insurers, and Seller will cooperate with Purchaser in obtaining the insurance proceeds and such agreements from Seller's insurers.  If the Property is not materially damaged, then Purchaser shall not have the right to terminate this Agreement, but Seller shall, at its cost, repair the damage before the Closing, which may be extended at Purchaser's option for such period of time as is necessary to accomplish such repair, in a manner reasonably satisfactory to Purchaser or, if repairs cannot be completed before the Closing, assign the Purchaser all insurance proceeds (including any rent loss insurance applicable to any period on and after the Closing Date) relating to such damage and credit Purchaser at Closing for any deductible imposed by the hazard insurance.  "<u>Material damage</u>" and "<u>Materially damaged</u>" means damage reasonably exceeding two (2) percent of the Purchase and Sale Consideration to repair or which, in Purchaser's reasonable estimation, will take longer than ninety (90) days to repair.

4.3   <u>Condemnation</u>.  In the event any proceedings in eminent domain are contemplated, threatened or instituted by any governmental or quasi-governmental body having the power of eminent domain with respect to the Property or any portion thereof, Purchaser may, at its option, by notice to Seller given within twenty (20) business days after Seller notifies Purchaser of such proceedings (and if necessary the Closing Date shall be extended to give Purchaser the full twenty (20) business day period to make such election):  (i) terminate this Agreement, in which case the Deposit will be immediately returned to Purchaser; or (ii) proceed under this Agreement, in which event Seller shall, at the Closing, assign to Purchaser its entire right, title and interest in and to any condemnation award, and Purchaser shall have the sole right during the pendency of this Agreement to negotiate and otherwise deal with the condemning authority in respect of such matter.

## ARTICLE 5: CLOSING

5.1   <u>Closing</u>.  The consummation of the transaction contemplated herein ("<u>Closing</u>") shall occur on the Closing Date at the offices of Seller's counsel or Purchaser's lender's counselor as otherwise agreed by the parties.

5.2   <u>Conditions to the Parties' Obligations to Close</u>.

5.2.1   The obligation of Purchaser to proceed to Closing shall be conditioned on the satisfaction of the following (or waiver by Purchaser).

*Execution Copy*

(a) Seller and Buyer shall have complied with the terms and conditions of Article 9 hereof and the Bankruptcy Court shall have entered either, (i) Orders (y) approving the Agreement and authorizing bidding and sale procedures which culminate in an Auction ("Bid Procedures Order") and (z) confirming the results of the Auction and authorizing the Seller to close ("Sale Approval Order"), or (ii) an Order confirming the Seller's Chapter 11 Plan which, *inter alia*, provides for the same relief as set forth in 5.2.1(a)(i)(y) ("Confirmation Order").

(b) Except for the Bankruptcy Case, there shall exist no pending suits, proceedings, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, against the Seller that would materially and adversely affect Seller's ability to perform its obligations under this Agreement;

5.2.2 If any condition to Purchaser's obligation to proceed with the Closing hereunder has not been satisfied and/ or the Seller is unable to obtain approval and authority from the Bankruptcy Court to proceed with the transaction contemplated herein, Purchaser may, in its sole discretion, (i) terminate this Agreement by delivering written notice to Seller on or before the Closing Date, except that Purchaser shall allow Seller thirty (30) days, or such longer period of time, if requested by Seller, as Purchaser shall allow after its notice within which to satisfy such condition before termination, (ii) elect to extend the Closing until such condition is satisfied, or (iii) elect to consummate the transaction, notwithstanding the non-satisfaction of condition in which event such party shall be deemed to have waived any such condition. The parties acknowledge that the Bankruptcy Court approval of the Agreement is required and thus cannot be waived by either party. The failure of a condition due to the breach of a party shall not relieve such breaching party from any liability it would otherwise have hereunder. In the event Purchaser elects to terminate this Agreement pursuant to the terms of this Section 5.2.2, the Deposit shall be returned to Purchaser and the parties shall have no further obligations to each other.

5.2.3 Notwithstanding anything herein to the contrary, Seller shall have the right, in its sole discretion, to elect to proceed with the Auction and Closing prior to the entry of the Confirmation Order and such election shall not constitute a default hereunder. In such case the Seller shall obtain authority to consummate the transactions contemplated hereunder pursuant to section 363 of the Bankruptcy Code through entry of the Bid Procedures Order and Sale Approval Order.

5.3 <u>Seller's Deliveries at Closing</u>. Seller shall deliver at Closing, the following:

(a) <u>Deed</u>. A bargain and sale deed with covenant against grantor's acts in form provided for under the law of the State of New York and mutually satisfactory to the parties, executed and acknowledged by Seller, conveying to Purchaser good, indefeasible and marketable fee simple title to the Real Property, subject only to the Permitted Exceptions (the "Deed"). Notwithstanding the foregoing, in the event that any changes required by law or the accepted standard form of bargain and sale deed with covenants against grantor's acts occur between the date of this Purchase and Sale Agreement and closing, the form of Deed shall be modified accordingly;

1408982_4
0142820-001

*Execution Copy*

(b) <u>Bill of Sale</u>. A Bill of Sale, executed and acknowledged by Seller, vesting in Purchaser good title to the property described therein free of any claims, except for the Permitted Exceptions to the extent applicable;

(c) <u>State Law Disclosures</u>. Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property;

(d) <u>FIRPTA</u>. A Foreign Investment in Real Property Tax Act affidavit executed by Seller. If Seller fails to provide the necessary affidavit and/or documentation of exemption on the Closing Date, Purchaser may proceed with withholding provisions as provided by law;

(e) <u>Authority</u>. Evidence of the existence, organization and authority of Seller and of the authority of the persons executing documents on behalf of Seller reasonably satisfactory to the Title Company; and

(f) <u>Title Documents</u>. All title affidavits and other documents reasonably required by the Title Company or Purchaser, including, but not limited to, required transfer tax forms and payment of any transfer tax, if required;

(g) <u>Vacant</u>. The delivery of the Property and all buildings and improvements comprising a part thereof vacant and free of leases or tenancies; and

(g) <u>Keys.</u> Seller shall deliver to Purchaser all keys in Seller's possession, relating to the Property that Purchaser may reasonably require in connection with its ownership and operation of the Property.

5.4 <u>Purchaser's Deliveries at Closing</u>. At Closing, Purchaser shall deliver the following:

(a) <u>Purchase Price</u>. On the Closing Date, the Purchase Price less the Deposit, plus or minus applicable prorations, in certified funds and/or in immediate, same day federal funds wired for credit into the Seller's counsel's escrow account, or as otherwise directed prior to Closing;

(b) <u>State Law Disclosures</u>. Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property;

(c) <u>Authority</u>. Evidence of the existence, organization and authority of Purchaser and of the authority of the persons executing documents on behalf of Purchaser reasonably satisfactory to the Title Company; and

(d) <u>Title Documents</u>. All title affidavits and other documents reasonably required by the Title Company or Purchaser.

*Execution Copy*

5.5  Possession. Except as expressly provided herein, Seller shall deliver possession of the Property AS-IS to Purchaser at the Closing, subject only to the Permitted Exceptions.

## ARTICLE 6: PRORATIONS

6.1  Prorations. The items in this Paragraph 6.1 shall be prorated between Seller and Purchaser as of the close of the day immediately preceding the Closing Date, the Closing Date being a day of income, if any, and expense to Purchaser:

(a)  Taxes and Assessments. Purchaser shall receive a credit for any accrued but unpaid general real estate taxes and assessments (including without limitation any assessments imposed by private covenant, "Taxes") applicable to any period before the Closing Date, even if such Taxes are not yet due and payable. If the amount of any Taxes has not been determined as of Closing, such credit shall be based on 110 percent of the most recent ascertainable Taxes and shall be re-prorated upon issuance of the final tax bill. The Seller is not aware of any assessments.

(b)  Utilities. Prorations for utilities, including water, sewer, electric, and gas, as applicable, shall be based upon the last reading of meters prior to the Closing. Seller shall endeavor to obtain meter readings on the day before the Closing Date, and if such readings are obtained, there shall be no proration of such items. Seller shall pay at Closing the bills therefor for the period to the day preceding the Closing, and Purchaser shall pay the bills therefor for the period subsequent thereto. If the utility company will not issue separate bills, Purchaser will receive a credit against the Purchase Price for Seller's portion and will pay the entire bill prior to delinquency after Closing. Seller shall obtain a final reading of the water meter no earlier than 30 days in advance of Closing.

6.2  Final Adjustment After Closing. In the event that final bills are not available or cannot be issued prior to Closing for any item being prorated under Paragraph 6.1, then Purchaser and Seller agree to allocate such items on a fair and equitable basis as soon as such bills are available, final adjustment to be made as soon as reasonably possible after the Closing. Payments in connection with the final adjustment shall be due within 30 days of written notice.

6.3  Utility Deposits. Seller shall be entitled to refunds for existing utility deposits and Purchaser will make its own deposits.

6.4  Sales, Transfer, and Documentary Taxes. Insofar as this Agreement contemplates the Closing following entry of the Confirmation Order, Seller has advised the Purchaser that the sale shall not be taxed under any law imposing a stamp or similar tax as provided for in section 1146(a) of the Bankruptcy Code and the Confirmation Order shall include, *inter alia*, provisions providing for such exemption. In the event that Seller elects to proceed with Auction and Closing prior to entry of a Confirmation Order, the transaction shall not be eligible for such exemption and the Seller shall be responsible for the payment of all such transfer taxes.

*Execution Copy*

## ARTICLE 7: REPRESENTATIONS AND WARRANTIES

    7.1    <u>Seller's Representations and Warranties</u>. As a material inducement to Purchaser to execute this Agreement and consummate this transaction, Seller represents and warrants to the Purchaser that:

    (a)    <u>Organization and Authority</u>. Seller is in good standing and is qualified to do business in the state where the Property is located. Subject to Bankruptcy Court authority, Seller has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Seller at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Seller, enforceable in accordance with their terms.

    (b)    <u>Conflicts and Pending Actions or Proceedings</u>. There is no agreement to which Seller is a party or, to Seller's knowledge, binding on Seller which is in conflict with this Agreement. Except for the Bankruptcy Case, there is no action or proceeding pending or, to Seller's knowledge, threatened against Seller or relating to the Property, including, without limitation, any condemnation proceedings which challenges or impairs Seller's ability to execute or perform its obligations under this Agreement or which has or would have an adverse impact on the Property.

    (c)    Except as specifically provided in this Agreement, the Seller makes no other representations and warranties with respect to this transaction. Purchaser is purchasing the subject Property "as is" and "where-as" without any further representations or warranties by the Seller other than those specifically set forth herein.

    7.2    <u>Purchaser's Representations and Warranties</u>. As a material inducement to Seller to execute this Agreement and consummate this transaction, Purchaser represents and warrants to Seller that:

    (a)    <u>Organization and Authority</u>. Purchaser has been duly organized and is validlyexisting as a limited liability company, in good standing in the State of New York and will be qualified to do business in the state in which the Real Property is located on the Closing Date. Purchaser has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Purchaser at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Purchaser, enforceable in accordance with their terms.

    (b)    <u>Conflicts and Pending Action</u>. There is no agreement to which Purchaser is a party or to Purchaser's knowledge binding on Purchaser which is in conflict with this Agreement. There is no action or proceeding pending or, to Purchaser's knowledge, threatened against

*Execution Copy*

Purchaser which challenges or impairs Purchaser's ability to execute or perform its obligations under this Agreement.

7.3   Survival of Representations and Warranties. Except for any representation or warranty which, by its terms, does not survive to Closing, the representations and warranties set forth in this Article 7 are made as of the date of this Agreement and are remade as of the Closing Date and shall not be deemed to be merged into or waived by the instruments of Closing, but shall survive the Closing. Each party agrees to defend and indemnify the other against any claim, liability, damage or expense asserted against or suffered by such other party arising out of the breach or inaccuracy of any such representation or warranty.

## ARTICLE 8: DEFAULT AND REMEDIES

8.1   Seller's Default. If this transaction fails to close as a result of Seller's default, Purchaser shall be entitled to such remedies for breach of contract as may be available at law and in equity, including without limitation, the remedy of specific performance.

8.2   Purchaser's Default. If this transaction fails to close due to the default of Purchaser, then Seller's sole remedy in such event shall be to terminate this Agreement and to retain the Deposit plus interest earned thereon as liquidated damages, Seller waiving all other rights or remedies in the event of such default by Purchaser. The parties acknowledge that Seller's actual damages in the event of a default by Purchaser under this Agreement will be difficult to ascertain, and that such liquidated damages represent the parties' best estimate of such damages.

8.3   Notice of Default. Except for a party's failure to close on the Closing Date, neither party shall have the right to declare a default by the other party and terminate this Agreement because of a failure by such other party to perform under the terms of this Agreement unless the other party shall fail to cure such failure to perform within ten (10) days after its receipt of written notice of such failure to perform.

## ARTICLE 9: BANKRUPTCY COURT PROCEDURE

9.1   Sale Motion. As soon as is practicable after execution and delivery of this Agreement, Seller shall file with the Bankruptcy Court (i) a motion (including all supporting papers, proposed bidding procedures, and notices), reasonably satisfactory in form and substance to Purchaser, seeking entry of a Bid Procedures Order and Sale Approval Order (the "Sale Motion") and/ or (ii) a Chapter 11 Plan ("Plan") which provides, *inter alia*, for the same relief as the Sale Motion. Seller represents that it shall diligently and in good faith pursue the Bankruptcy Court approvals set forth in this paragraph. The Seller shall have the absolute right to determine whether to obtain Bankruptcy Court approval of this Agreement by Sale Motion or Plan and following the Auction, if held, to close pre or post-confirmation of the Plan. Seller shall provide Purchaser with a copy of the Sale Motion and/or Plan.

9.2   Bid Procedures. The Bid Procedures Order and/ or Plan shall provide, among

1438983_4
0142820-001

*Execution Copy*

other things, that, in order to participate in the Auction, each prospective bidder must previously have delivered to Seller current financial statements of such person or other evidence of its financial wherewithal to consummate the purchase of the Property. Seller shall select those persons that, in Seller's reasonable business judgment, have demonstrated the necessary financial wherewithal and qualification to consummate the purchase of the Property (a "Qualified Bidder"). Purchaser shall constitute a Qualified Bidder for all purposes. Seller further agrees that the terms and conditions of the Auction, as proposed in the Sale Motion, shall require, inter alia, (i) that the Qualified Bidder offers to purchase the Property upon the terms and conditions substantially similar to or better than those set forth in this Agreement (including, without limitation, by requiring the Qualified Bidder to deposit with the Escrow Agent on or prior to the date of the Auction, an amount equal to ten percent (10%) of its initial bid), (ii) that such offer not be conditioned on obtaining financing or the outcome of unperformed due diligence by the Qualified Bidder, (iii) is not conditioned upon the Bankruptcy Court's approval of any bid protections, such as break-up fees, termination fees, expense reimbursement, or similar type of payment, (iv) is accompanied by a copy of this Agreement marked to show any amendments and modifications thereto, and (v) that the initial higher and better offers for the Property be at least Seventy Nine Thousand Dollars ($79,000) higher than the Purchase Price set forth in this Agreement (which amount consists of the Termination Fee (as defined below) and an initial overbid amount of Twenty Five Thousand Dollars ($25,000.00)), and that subsequent higher and better offers be in increments of not less than Twenty Five Thousand Dollars ($25,000). Seller shall also use its reasonable efforts to obtain any other approvals or consents from the Bankruptcy Court that may be reasonably necessary to consummate the transactions contemplated in this Agreement. In the event that a competing bid is approved by the Bankruptcy Court (an "Alternative Transaction"), then Seller shall, immediately and without further order of the Bankruptcy Court, (a) return Purchaser's Deposit and (b) pay, from closing proceeds from an Alternative Transaction, to Purchaser a sum equal to $54,000 (the "Termination Fee").

## ARTICLE 10: BROKERS AND ADVISORS

10.1    Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any broker, finder, consultant, advisor, or professional in the capacity of a broker or finder (each a "Broker") in connection with this Agreement or the transactions contemplated herein. Purchaser hereby agrees to indemnify, defend and hold Seller harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from any claim for commission, fees or other compensation or reimbursement for expenses made by Broker engaged by or claiming to have dealt with Purchaser in connection with this Agreement or the transactions contemplated hereby.

10.2    Seller represents and warrants to Purchaser that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any Broker in connection with this Agreement or the transactions contemplated herein. Seller hereby agrees to indemnify, defend and hold Purchaser and its direct and indirect shareholders, officers, directors, partners, principals, members, employees, agents, contractors and any successors or assigns of the foregoing,

1438982_1
0142830-001

*Execution Copy*

harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any Broker, engaged by or claiming to have dealt with Seller in connection with this Agreement or the transactions contemplated hereby.

   10.3 The provisions of this Section 10 shall survive the termination of this Agreement or the Closing.

## ARTICLE 11: MISCELLANEOUS

   11.1 <u>Parties Bound</u>.  Neither party may assign this Agreement without the prior written consent of the other, and any such prohibited assignment shall be void, except that the Purchaser may assign this Agreement to a limited partnership or limited liability company controlled by or under common control of the Purchaser without the Seller's consent.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devisees of the parties.

   11.2 <u>Headings</u>.  The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

   11.3 <u>Invalidity and Waiver</u>.  If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and, to the greatest extent legally possible, effect shall be given to the intent manifested by the portion held invalid or inoperative.  The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

   11.4 <u>Governing Law</u>.  This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the State of New York.

   11.5 <u>Survival</u>.  The provisions of this Agreement that contemplate performance after the Closing and the obligations of the parties not fully performed at the Closing shall survive the Closing and shall not be deemed to be merged into or waived by the instruments of Closing.

   11.6 <u>No Third Party Beneficiary</u>.  This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third party beneficiary, decree, or otherwise.

   11.7 <u>Entirety and Amendments</u>.  This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property.  This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

*Execution Copy*

11.8  **Attorneys' Fees**. Should either party employ attorneys to enforce any of the provisions hereof, the party against whom any final judgment is entered agrees to pay the prevailing party all reasonable costs, charges, and expenses, including attorneys' fees, expended or incurred in connection therewith.

11.9  **Notices**. All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Paragraph 1.1. Any such notices shall be either (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one business day after deposit with such courier, (b) sent by telefax, in which case notice shall be deemed delivered upon transmission of such notice, (c) sent by personal delivery, in which case notice shall be deemed delivered upon receipt, or (d) by e-mail, in which case notice shall be deemed delivered upon transmission of such notice, provided that receipt of such e-mail is confirmed by the recipient. A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notices given by counsel to the Purchaser shall be deemed given by Purchaser and notices given by counsel to the Seller shall be deemed given by Seller.

11.10  **Construction**. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

11.11  **Calculation of Time Periods**. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included at, unless such last day is a Saturday, Sunday or legal holiday for national banks in the location where the Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday. The last day of any period of time described herein shall be deemed to end at 6:00 p.m. New York time.

11.12  **Execution in Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. To facilitate execution of this Agreement, the parties may execute and exchange by e-mail or telephone facsimile counterparts of the signature pages, which shall have the same validity as an original.

11.13  **Further Assurances**. In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by either party at Closing, each party agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Purchaser.

*Execution Copy*

   11.14 <u>Post-Effective Date Inspection.</u> The Purchaser shall have the right, upon reasonable notice to Seller, to inspect, take measurements or walk through the Premises with contractors prior to the Closing.

   11.16 <u>Assignment of Mortgage.</u> Seller agrees to cooperate with Purchaser to obtain an assignment of mortgage from Seller's existing lender to Purchaser's lender. However, any additional cost or expense to Seller shall be borne by the Purchaser and the assignment shall not be a requirement, contingency or a condition of closing.

SIGNATURE PAGE FOLLOWS

1438982_1
0147820-001



*Execution Copy*

SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT
BY AND BETWEEN
BROOKLYN RENAISSANCE, LLC (SELLER)
AND
JJC REAL ESTATE LLC (PURCHASER)

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year written below.

Seller
BROOKLYN RENAISSANCE, LLC

By: _____
Name:  James McGown
Title:   Managing Member

Date: 8/30/15

Purchaser
JJC REAL ESTATE LLC

By: _Fai Chin_____

Date: 8/26/15

Escrow Agent has executed this Agreement in order to confirm that the Escrow Agent has received and shall hold the Purchaser's Deposit and the interest earned thereon, in escrow, and shall disburse the Purchaser's Deposit, and the interest earned thereon as required under this Agreement.

DelBello Donnellan Weingarten
Wise & Wiederkehr, LLP

By: _____
Jonathan S. Pasternak, Partner
Julie Cuffey

Date: 9/8/15

1438982_4
0142820-001