.

**EXHIBIT "E"**

Contract of Sale for New York office, commercial and multi-family residential premises

# Contract of Sale—Office, Commercial and Multi-Family Residential Premises

## Table of Contents

Schedule A. Description of premises (to be attached)
Schedule B. Permitted exceptions
Schedule C. Purchase price
Schedule D. Miscellaneous
Schedule E Rent schedule (to be attached)
Section 1. Sale of premises and acceptable title
Section 2. Purchase price, acceptable funds, existing mortgages, purchase money mortgage and escrow of downpayment
Section 3 The closing
Section 4 Representations and warranties of seller
Section 5. Acknowledgments of purchaser
Section 6. Seller's obligations as to leases
Section 7. Responsibility for violations

Section 8. Destruction, damage or condemnation
Section 9. Covenants of seller
Section 10. Seller's closing obligations
Section 11. Purchaser's closing obligations
Section 12. Apportionments
Section 13. Objections to title, failure of seller or purchaser to perform and
Section 14. Broker
Section 15. Notices
Section 16. Limitations on survival of representations, warranties, covenants and other obligations
Section 17. Miscellaneous provisions
Signatures and receipt by escrowee

CONTRACT dated the *10th* day of ~~July, 2015~~ *August 2015*,

Between:

BROOKLYN RENAISSANCE LLC

Address:
320 COURT STREET, BROOKLYN, NY 11231
("Seller") and

~~DANIEL BARCELOWSKY~~ *MGJR Nominee LLC or its assigns*

Address:  *232 Broadway, Suite 400, Brooklyn, NY 11241*

("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

## Schedule A
## DESCRIPTION OF PREMISES

The Premises are located at or known as:
Street Address:84 CLINTON AVENUE
City:Brooklyn    State:NY    Zip:11205
Tax Map Designation.  Section    Block:1887    Lot:64

(☑ metes and bounds description attached hereto)

## Schedule B
## PERMITTED EXCEPTIONS

1. Zoning regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title unmarketable.

2. Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3. ~~The existing tenancies and tenancies statements, assignments of leases and other collateral assignments therein~~

4. ~~Leases and Tenancies specified in the Rent Schedule and any new leases or tenancies not prohibited by this contract.~~

5. Unpaid installments of assessments not due and payable on or before the Closing Date.

6. ~~Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewal or filed against property or equipment no longer located on the Premises or owned by Tenants.~~

7.    (a)    Rights of utility companies to lay, maintain install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises.

(b) Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises.

(c) Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

(d) Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable. ~~For the purposes of this contract, none of the facts shown on the survey, if any, identified below shall be deemed to render title unmarketable, and Purchaser shall accept title subject thereto:~~

## Schedule C
## PURCHASE PRICE

The Purchase Price shall be paid as follows:
(a)   By check subject to collection, the receipt of which is hereby acknowledged by Seller

$ 125,600.⁰⁰
~~$200,000.00~~

$2,875,000.⁰⁰
~~$2,250,000.00~~
$

(b) By check or checks delivered to Seller at the Closing in accordance with the provisions of §2.02;
(c) By acceptance of title subject to the following Existing Mortgage(s);
(d) By execution and delivery to Seller by Purchaser or his assignee of a note secured by a Purchase Money Mortgage on the Premises, in the sum of $ _____ payable as follows:

Interest Rate:          Term:          Monthly payment:          Prep. Feet          Other provisions:          $
Making for a total Purchase Price of:                                                                    $2,500,000.00

Schedule D
MISCELLANEOUS

_or title abstract company_

1. Title insurer designated by the parties (§1.02)any reputable title company doing business in the State of New York

2. Last date for consent by Existing Mortgagee(s) [§2.03(b)]:N/A

3. Maximum Interest Rate of any Refinanced Mortgage (§2.04(b):N/A

4. Prepayment Date on or after which Purchase Money Mortgage may be prepaid (§2.04(e)):N/A

5. Seller's tax ID Nos [§2.05] #1:          #2:          #3:          #4:

6. Buyer's tax ID Nos [§2.05] #1:          #3:          #3,          #4:

7. Scheduled time and date of Closing (§3.01): ~~being 20 days after fully executed contract if sale received by seller.~~ _subject to Bankruptcy_
_Court approval. See Rider._
Time 2:00 o'clock.

8. Place of Closing (§3.01):Seller's attorney

9. Assessed valuation of Premises (§4.10):TBD BY PURCHASER THROUGH DUE DILLIGENCE

10. Fiscal year and annual real estate taxes on Premises (§4.10): Fiscal Year:          Annual Taxes:TBD BY PURCHASER

THROUGH DUE DILLIGENCE

11. Tax abatements or exemptions affecting Premises (§4.10):TBD BY PURCHASER THROUGH DUE DILLIGENCE

12. Assessments on Premises (§4.12):TBD BY PURCHASER THROUGH DUE DILLIGENCE

13. Maximum Amount which Seller must spend to cure violations, etc. (§7.02):NIL(limit) ~~$50,000.00~~ $50,000.⁰⁰ (Fifty Thousand Dollars)

14. Maximum Expense of Seller to cure title defects, etc. (§13.02):$5,046.00 $50,000.⁰⁰ (Fifty Thousand Dollars)

15. Broker, if any (§14.01):NONE

16. Party to pay broker's commission (§14.01):NONE
17. Address for notices (§15.01):
    If to Seller:BROOKLYN RENAISSANCE LLC
    320 COURT STREET
    BROOKLYN, NY 11231

    with a copy to:~~JARED RICH, ESQ.~~  DelBello Donnellan et al,
    ~~11 Court Street Suite 217~~  One North Lexington Avenue, 11th Floor
    ~~Brooklyn, NY 11201~~  White Plains, N.Y. 10601

    If to Purchaser:~~DANIEL BARESLOWSKY~~ MGJR Nominee LLC
    232 Broadway, Suite 400
    Brooklyn, N.Y. 11211

    with a copy to:KENNETH HOROWITZ,ESQ
    KRISS & FEUERSTEIN LLP
    360 LEXINGTON AVENUE, 12TH FLOOR
    NEW YORK, NY 10017

180:
18. Limitation Date for actions based on Seller's surviving representations and other obligations (§16.01):~~90 days~~ after closing

19. Additional Schedules or Riders (§17.03):One rider annexed hereto and made part hereof

Schedule E
RENT SCHEDULE

([ ] If more than four tenants, check, and annex a rent schedule rider hereto; otherwise, enter information below)

| Name | Apt. No. | Rent | Due | Security |
|------|----------|------|-----|----------|

Section 1. Sale of Premises and Acceptable Title

**§1.01.** Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract:

(a) the parcel of land more particularly described in Schedule A attached hereto ("Land"); (b) all buildings and improvement situated on the Land (collectively, "Building");

(c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway;

(d) the appurtenances and all the estate and rights of Seller in and to the Land and Building; and

(e) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building (collectively, "Premises"). The Premises are located at or known as
Street Address:44 CLINTON AVENUE
City: Brooklyn  State: NY  Zip:11205
Tax Map Designation: Section:   Block:1887 Lot:64

**§1.02.** Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract, subject only to:

(a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and

(b) such other matters as (i) the title insurer specified in Schedule D attached hereto (or if none is so specified, then any member of the New York Board of Title Underwriters) shall be willing, without special premium, to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises and (ii) shall be accepted by any lender described in Section 2?4 of the Real Property Law ("Institutional Lender") which has committed in writing to provide mortgage financing to Purchaser for the purchase of the Premises ("Purchaser's Institutional Lender"), except that if Seller's acceptance by Purchaser's Institutional Lender is unreasonably withheld or delayed, such acceptance shall be deemed to have been given.

Section 2. Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage and Escrow of Down payment

**§2.01.** The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises as provided in Schedule C attached hereto is $2,500,000.00

**§2.02.** All monies payable under this contract, unless otherwise specified in this contract, shall be paid by:

(a) certified checks of Purchaser or any person making a purchase money loan to Purchaser drawn on any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York or

(b) official bank checks drawn by any such banking institution, payable to the order of Seller, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of one-half of one percent of the Purchase Price shall be acceptable for sums payable to Seller at the Closing.

**§2.03.** (a) If Schedule C provides for the acceptance of title by Purchaser subject to one or more existing mortgages (collectively, "Existing Mortgage(s)"), the amounts specified in Schedule C with reference thereto may be approximate. If at the Closing the aggregate principal amount of the Existing Mortgage(s), as reduced by payments required there under prior to the Closing, is less than the aggregate amount of the Existing Mortgage(s) as specified in Schedule C, the difference shall be added to the monies payable at the Closing, unless otherwise expressly provided herein.

(b) If any of the documents constituting the Existing Mortgage(s) or the note(s) secured thereby prohibits or restricts the conveyance of the Premises or any part thereof without the prior consent of the holder or holders thereof ("Mortgagee(s)") or confers upon the Mortgagee(s) the right to accelerate payment of the indebtedness or to change the terms of the Existing Mortgage(s) in the event that a conveyance is made without consent of the Mortgagee(s), Seller shall notify such Mortgagee(s) of the proposed conveyance to Purchaser within 10 days after execution and delivery of this contract, requesting the consent of such Mortgagee(s) thereto. Seller and Purchaser shall furnish the Mortgagee(s) with such information as may reasonably be required in connection with such request and shall otherwise cooperate with such Mortgagee(s) and with each other in an effort expeditiously to procure such consent, but neither shall be obligated to make any payment to obtain such consent. If such Mortgagee(s) shall fail or refuse to grant such consent in writing on or before the date set forth in Schedule D or shall require a condition of the granting of such consent

(i) that additional consideration be paid to the Mortgagee(s) and neither Seller nor Purchaser is willing to pay such additional consideration or

(ii) that the terms of the Existing Mortgage(s) be changed and Purchaser is unwilling to accept such change, then unless Seller and Purchaser mutually agree to extend such date or otherwise modify the terms of this contract, Purchaser may terminate this contract in the manner provided in §13.02.

If Schedule C provides for a Purchase Money Mortgage (as defined in §2.04), Seller may also terminate this contract in the manner provided in §13.02. If any of the foregoing circumstances occur or if Seller is unwilling to accept any such change in the terms of the Existing Mortgage(s),

**§2.04.** (a) If Schedule C provides for payment or delivery of a portion of the Purchase Price by execution and delivery to Seller of a note secured by a purchase money mortgage ("Purchase Money Mortgage"), such note and Purchase Money Mortgage shall be drawn by the attorney for the Seller on the standard forms of the New York Board of Title Underwriters then in effect for notes and for mortgages of like lien, as modified by this contract. At the Closing, Purchaser shall pay the mortgage recording tax and recording fees therefore and the filing fees for any financing statements delivered in connection therewith.

(b) If Schedule C provides for the acceptance of title by Purchaser subject to Existing Mortgage(s) prior in lien to the Purchase Money Mortgage, the Purchase Money Mortgage shall provide that it is subject and subordinate to the lien(s) of the Existing Mortgage(s) and shall be subject and subordinate to any extensions, modifications, renewals, consolidations, substitutions or replacements thereof (collectively, "Refinancing" or "Refinanced Mortgage"), provided that (i) the rate of interest payable under a Refinanced Mortgage shall not be greater than that specified in Schedule D as the Maximum Interest Rate or, if no Maximum Interest Rate is specified in Schedule D, shall not by greater than the rate of interest that was payable on the refinanced indebtedness immediately prior to such Refinancing, and (ii) if the principal amount of a Refinanced Mortgage plus the principal amount of other Existing Mortgage(s), if any, remaining after placement of a Refinanced Mortgage exceeds the amount of principal owing and unpaid on all mortgages on the Premises superior to the Purchase Money Mortgage immediately prior to the Refinancing, an amount equal to the excess shall be paid at the closing of the Refinancing to the holder of the Purchase Money Mortgage in reduction of principal (payments due there under in inverse order of maturity). The Purchase Money Mortgage shall further provide that the holder thereof shall, on demand and without charge therefore, execute, acknowledge and deliver any agreement or agreements reasonably required by the mortgagee to confirm such subordination.

(c) The Purchase Money Mortgage shall contain the following additional provisions:

(i) "The mortgagor or any owner of the mortgaged premises shall have the right to prepay the entire unpaid indebtedness together with accrued interest, but without penalty, at any time on or after [insert the day following the last day of the fiscal year of the mortgagee in which the Closing occurs or, if a Prepayment Date is specified in Schedule D, the specified Prepayment Date], or not less than 10 days' written notice to the holder hereof."

(ii) "Notwithstanding anything to the contrary contained herein, the obligation of the mortgagor for the payment of the indebtedness and for the performance of the terms, covenants and conditions contained herein and in the note secured hereby is limited solely to recourse against the property secured by this mortgage, and in no event shall the mortgagor or any principal of the mortgagor, disclosed or undisclosed, be personally liable for any breach of or default under the note or this mortgage or for any deficiency resulting from or through any proceedings to foreclose this mortgage, nor shall any deficiency judgment, money judgment or other personal judgment be sought or entered against the mortgagor or any principal of the mortgagor, disclosed or undisclosed, but the foregoing shall not adversely affect the lien of this mortgage or the mortgagee's right of foreclosure."

(iii) "In addition to performing its obligations under Section 274-a of the Real Property Law, the mortgagee, if other than one of the institutions listed in Section 274-a agrees that, within 10 days after written request by the mortgagor, but not more than twice during any period of 12 consecutive months, it will execute, acknowledge and deliver without charge a certificate of reduction in recordable form (a) certifying as to (1) the then unpaid principal balance of the indebtedness secured hereby, (2) the maturity date thereof, (3) the rate of interest, (4) the last date to which interest has been paid and (5) the amount of any escrow deposits then held by the mortgagee, and (b) stating, to the knowledge of the mortgagee, whether there are any alleged defaults hereunder and, if so, specifying the nature thereof."

(iv) "All notices required or desired to be given under this mortgage shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed to the mortgagor and mortgagee at the addresses specified in this mortgage or to such other parties or at such other addresses, not exceeding two, as may be designated in a notice given to the other party or parties in accordance with the provisions hereof."

(v) The additional provisions, if any, specified in a rider hereto.

§2.05. (a) If the sum paid under paragraph (a) of Schedule C or any other sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment") are paid by check or checks drawn to the order of and delivered to Seller's attorney or another escrow agent ("Escrowee"), the Escrowee shall hold the proceeds thereof in escrow in a special bank account [or as otherwise agreed in writing by Seller, Purchaser and Escrowee] until the Closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrowee shall hold such proceeds in an interest-bearing account ~~at the rate~~ interest ~~[if carried thereon,~~ shall be paid to the same party entitled to the escrowed proceeds, and the party receiving such interest shall pay any income taxes thereon. The tax identification numbers of the parties are either set forth in Schedule D or shall be furnished to Escrowee upon request. At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from

the parties to this contract or a final judgment of a court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Supreme Court of the county in which the Land is located. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

**Section 3. The Closing**

§3.01. Except as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on the scheduled date and time of closing specified in Schedule D (the actual date of the Closing being herein referred to as "Closing Date") at the place specified in Schedule D.

**Section 4. Representations and Warranties of Seller**

Seller represents and warrants to Purchaser as follows:

§4.01. Unless otherwise provided in this contract, Seller is the sole owner of the Premises. Or shall be at Closing.

§4.02. ~~If the Premises are encumbered by no existing Mortgage(s), no written notice has been received from the Mortgagee(s) asserting that a default or breach exists thereunder which remains uncured and no such notice shall have been received and remain uncured on the Closing Date. If copies of documents constituting the Existing Mortgage(s) and note(s) secured thereby have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals and the Existing Mortgage(s) and note(s) secured thereby have not been modified or amended except as shown in such documents.~~

§4.03. ~~The information concerning written leases (which, together with all amendments and modifications thereof are collectively referred to as "Leases") and any tenancies in the Premises not arising out of the Leases [collectively, "Tenancies") set forth in Schedule E attached hereto ("Rent Schedule") is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases or Tenancies of any space in the Premises other than those set forth therein and any subleases or subtenancies. Except as otherwise set forth in the Rent Schedule or elsewhere in this contract:~~

(a) all of the Leases are in full force and effect and none of them has been modified, amended or extended;

(b) no tenant or extension options have been granted to tenant;

(c) no tenant has an option to purchase the Premises;

(d) the rents set forth are being collected on a current basis and there are no arrearages in excess of one month;

(e) no tenant is entitled to rental concessions or abatements for any period subsequent to the scheduled date of closing;~~

(f) Seller has not sent written notice to any tenant claiming that such tenant is in default, which default remains uncured;

(g) no action or proceeding instituted against Seller by any tenant of the Premises is presently pending in any court, except with respect to claims involving personal injury or property damage which are covered by insurance; and

(h) there are no security deposits other than those set forth in the Rent Schedule.

If any Leases which have been exhibited to and initialed by Purchaser or its representative contain provisions that are inconsistent with the foregoing representations and warranties, such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to the provisions of the Leases.

§4.04. If the Premises or any part thereof are subject to the New York City Rent Stabilization Law, Seller is and on the Closing Date will be a member in good standing of the Real Estate Industry Stabilization Association, and, except as otherwise set forth in the Rent Schedule, there are no proceedings with any tenant presently pending before the Conciliation and Appeals Board in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the Conciliation and Appeals Board that have not been complied with by Seller.

§4.05. If the Premises or any part thereof are subject to the New York City Emergency Rent and Rehabilitation Law, the rents shown are not in excess of the maximum collectible rents, and, except as otherwise set forth in the Rent Schedule, no tenants are entitled to abatements or similar allowances, there are no proceedings presently pending before the rent commission in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the rent commission that have not been complied with by Seller.

§4.06. If an insurance schedule is attached hereto, such schedule lists all insurance policies presently affecting coverage with respect to the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.07. If a payroll schedule is attached hereto, such schedule lists all employees presently employed at the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and, except as otherwise set forth in such schedule, none of such employees is covered by a union contract and there are no retroactive increases or other accrued and unpaid sums owed to any employees.

§4.08. If a schedule of service, maintenance, supply and management contracts ("Service Contracts") is attached hereto, such schedule lists all such contracts affecting the Premises, and the information set forth therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.09. If a copy of a certificate of occupancy for the Premises has been exhibited to and initialed by Purchaser or its representative, such copy is a true copy of the original and such certificate has not been amended, but Seller makes no representation as to compliance with any such certificate.

§4.10. The assessed valuation and real estate taxes set forth in Schedule D, if any, are the assessed valuation of the Premises and the taxes paid or payable with respect thereto for the fiscal year indicated in such schedule, Except as otherwise set forth in Schedule D, there are no tax abatements or exemptions affecting the Premises.

§4.11. Except as otherwise set forth in a schedule attached hereto, if any, if the Premises are used for residential purposes, each apartment contains a range and a refrigerator, and all of the ranges and refrigerators and all of the items of

personal property (or replacements thereof) listed in such schedule, if any, are and on the Closing Date will be owned by Seller free of liens and encumbrances other than the lien(s) of the Existing Mortgage(s), if any.

§4.12. Seller has no actual knowledge that any incinerator, boiler or other heating equipment on the Premises is being operated in violation of applicable law, if copies of a certificate or certificates of operation therefor have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals.

§4.13. Except as otherwise set forth in Schedule D, Seller has no actual knowledge of any assessment payable in annual installments, or any part thereof, which has become a lien on the Premises.

Section 5. Acknowledgments of Purchaser
Purchaser acknowledges that:

§5.01. Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §7.01, §8.01, and §9.04, shall accept the Premises "as is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this contract.

§5.02. Before entering into this contract, Purchaser has made such examination of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. In entering into this contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this contract, whether or not any such representations, warranties or statements were made in writing or orally.

Section 6. Seller's Obligations as to Leases

§6.01. Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not, without Purchaser's prior written consent, which consent shall not be unreasonably withheld:

(a) amend, renew or extend any Lease in any respect, unless required by law;

(b) grant a written lease to any tenant occupying space pursuant to a Tenancy; or

(c) terminate any Lease or Tenancy except by reason of a default by the tenant thereunder.

§6.02. Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space in the Building, which is presently vacant or which may hereafter become vacant without first giving Purchaser written notice of the identity of the proposed tenant, together with

(a) either a copy of the proposed lease or a summary of the terms thereof in reasonable detail and

(b) a statement of the amount of the brokerage commission, if any, payable in connection therewith and the terms of payment thereof. If Purchaser objects to such proposed lease, Purchaser shall so notify Seller within 4 business days after receipt of Seller's notice if such notice was personally delivered to Purchaser, or within 7 business days after the mailing of such notice by Seller to Purchaser, in which case Seller shall not enter into the proposed lease. Unless otherwise provided in a schedule attached to this contract, Purchaser shall pay to Seller at the Closing, in the manner specified in §2.02, the rent and additional rent that would have been payable under the proposed lease from the date on which the tenant's obligation to pay rent would have commenced if Purchaser had not so objected until the Closing Date, less the amount of the brokerage commission specified

in Seller's notice and the reasonable cost of alteration or other work required to be performed by the landlord under the terms of the proposed lease in suit the premises to the tenant's occupancy ("Reletting Expenses"), prorated in each case over the term of the proposed lease and apportioned as of the Closing Date. If Purchaser does not so notify Seller of its objection, Seller shall have the right to enter into the proposed lease with the tenant identified in Seller's notice and Purchaser shall pay to Seller, in the manner specified in §2.03, the Reletting Expenses, prorated in each case over the term of the lease and apportioned as of the later of the Closing Date or the rent commencement date. Such payment shall be made by Purchaser to Seller at the Closing. In no event shall the amount so payable to Seller exceed the sums actually paid by Seller on account thereof.

§6.03 If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this contract. Seller shall not grant any concessions or rent abatements for any period following the Closing without Purchaser's prior written consent. Seller shall not apply all or any part of the security deposit of any tenant unless such tenant has vacated the Premises.

§6.04. Seller does not warrant that any particular Lease of Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

Section 7. Responsibility for Violations

§7.01. Except-as-provided-in-§7.02-and-§7.03,-not-notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to the date of this contract by any governmental department, agency or bureau having jurisdiction to conditions affecting the Premises and all Regs which have attached to the Premises prior to the Closing pursuant to the Administrative Code of the City of New York, if applicable, shall be removed or complied with by Seller. If such removal or compliance has not been completed prior to the Closing, Seller shall pay to Purchaser at the Closing the reasonably estimated unpaid cost to effect or complete such removal or compliance, and Purchaser shall be required to accept title to the Premises subject thereto, except that Purchaser shall not be required to accept such title and may terminate this contract as provided in §13.02 if

(a) Purchaser's Institutional Lender reasonably refuses to provide financing by reason thereof or
(b) the building is a multiple dwelling and either
(i) such violation is rent impairing and causes rent to be unrecoverable under Section 302-a of the Multiple Dwelling Law or
(ii) a proceeding has been validly commenced by tenants and is pending with respect to such violation for a judgment directing deposit and use of rents under Article 7-A of the Real Property Actions and Proceedings Law. All such notes or notices of violations noted or issued on or after the date of this contract shall be the sole responsibility of Purchaser.

§7.02. If the reasonably estimated aggregate cost to remove or comply with any violations or liens which Seller is required to remove or comply with pursuant to the provisions of §7.01 shall exceed the Maximum Amount specified in Schedule D (or if none is so specified, the Maximum Amount shall be one-half of one percent of the Purchase Price), Seller shall have the right to cancel this contract, in which event the sole liability of Seller shall be as set forth in §13.02, unless Purchaser elects to accept title to the Premises subject to all such violations or liens, in which event Purchaser shall be entitled to a credit of an amount equal to the Maximum Amount against the monies payable at the Closing.

§7.03. Regardless of whether a violation has been noted or issued prior to the date of this contract, Seller's failure to remove or fully comply with the following violations shall not be an objection to title:

(a) any violations of New York City Local Law 5 of 1973, as amended (relating to fire safety in office buildings), if applicable, or

(b) any violations which a tenant is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use or occupancy. Purchaser shall accept the Premises subject to all such violations without any liability of Seller with respect thereto or any abatement of or credit against the Purchase Price, except that if Purchaser's Institutional Lender reasonably refuses to provide financing by reason of the violations described in (b) above, Purchaser shall not be required to accept the Premises subject thereto and Purchaser shall have the right to terminate this contract in the manner provided in §13.02.

§7.04. If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

Section 8. Destruction, Damage or Condemnation

§8.01. The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this contract.

Section 9. Covenants of Seller

Seller covenants that between the date of this contract and the Closing:

§9.01. The Existing Mortgage(s) shall not be amended or supplemented or prepaid in whole or in part. Seller shall pay or make, as and when due and payable, all payments of principal and interest and all deposits required to be paid or made under the Existing Mortgage(s).

§9.02. Seller shall not modify or amend any Service Contract or enter into any new service contract unless same is terminable without penalty by the then owner of the Premises upon not more than 30 days notice.

§9.03. If an insurance schedule is attached hereto, Seller shall maintain in full force and effect until the Closing the insurance policies described in such schedule or renewals thereof for no more than one year of those expiring before the Closing.

§9.04. No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.05. Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing.

§9.06. Seller shall allow Purchaser or Purchaser's representatives access to the Premises, the Leases and other documents required to be delivered under this contract upon reasonable prior notice at reasonable times.

Section 10. Seller's Closing Obligations

At the Closing, Seller shall deliver the following to Purchaser:

§10.04. A statutory form of bargain and sale deed without covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this contract.

§10.02. All Leases inhibited by Purchaser and all others in Seller's possession.

§10.03. A schedule of all cash security deposits, check or credit to Purchaser in the amount of such security deposits, including any interest thereon, held by Seller on the Closing Date under the terms of, if held by an institutional Lender, an assignment to Purchaser and written instructions to the holder of such deposits to transfer the same to Purchaser, and appropriate instruments of transfer or assignment with respect to any lease securities which are other than cash.

§10.04. A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

§10.05. All Service Contracts initiated by Purchaser and all others in Seller's possession which are in effect on the Closing Date and which are assignable by Seller.

§10.06. An assignment to Purchaser without recourse or warranty, of all of the Interest of Seller in those Service Contracts, Insurance policies, certificates, permits and other documents to be delivered to Purchaser at the Closing which are then in effect and are assignable by Seller.

§10.07. (a) Written consent(s) of the Mortgagee(s) if required under §3.03(b), and (b) certificate(s) executed by the Mortgagee(s) in proper form for recording and certifying (i) the amount of the unpaid principal balance thereof, (ii) the maturity date thereof, (iii) the interest rate, (iv) the last date to which interest has been paid thereon and (v) the amount of any escrow deposits held by the Mortgagee(s).

Seller shall pay the fees for recording such certificate(s). Any Mortgagee which is an institutional Lender may furnish a letter complying with Section 274-a of the Real Property Law in lieu of such certificate.

§10.08. An assignment of all Seller's right, title and interest in escrow deposits for real estate taxes, insurance premiums and other amounts, if any, then held by the Mortgagee(s).

§10.09. All original insurance policies with respect to which premiums are to be apportioned or, if unobtainable, true copies or certificates thereof.

§10.10. To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

§10.11. Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name.

§10.12. Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof.

§10.13. To the extent they are then in Seller's possession, copies of current painting and payroll records. Seller shall make all other building and tenant files and records available to Purchaser for copying, which obligation shall survive the Closing.

§10.14. An original letter executed by Seller or by its agent, advising the tenants of the Premises to

Purchaser, and directing that rents and other payments thereafter sent to Purchaser or to Purchaser may direct.

§10.15. Reduced-to-the-Mortgagee(s), executed by Seller or by its agent, advising of the sale of the Premises to Purchaser and directing that future bills and other correspondence should thereafter be sent to Purchaser or as Purchaser may direct.

§10.16. If Seller is a corporation and if required by Section 909 of the Business Corporation Law, a resolution of Seller's board of directors authorizing the sale and delivery of the deed and a certificate executed by the secretary or assistant secretary of Seller certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law. The deed referred to in §10.01 shall also contain a recital sufficient to establish compliance with such law.

§10.17. Possession of the Premises in the condition required by this contract, subject to the Leases and Tenancies, and keys therefor.

§10.18. Any other documents required by this contract to be delivered by Seller

Section 11. Purchaser's Closing Obligations
At the Closing, Purchaser shall:

§11.01. Deliver to Seller checks in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12, plus the amount of escrow deposits, if any, assigned pursuant to §10.08

§11.02. Deliver to Seller the Purchase Money Mortgage, if any, in proper form for recording, the note secured thereby, financing statements covering personal property, fixtures and equipment included in this sale and replacements thereof, all properly executed, and Purchaser shall pay the mortgage recording tax and recording fees for any Purchase Money Mortgage.

§11.03. Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenant with respect to tenant security deposits to the extent paid, credited or assigned to Purchaser under §10.03.

§11.04. Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause such returns and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§11.05. Deliver any other documents required by this contract to be delivered by Purchaser.

Section 12. Apportionments

§12.01. The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a) prepaid rents and Additional Rents (as defined in §12.03);

(b) interest on the Existing Mortgage(s);

(c) real estate taxes, water charges, sewer rents and vault charges, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(d) wages, vacation pay, pension and welfare benefits and other fringe benefits of all persons employed at the Premises whose employment was not terminated at or prior to the Closing;

(e) value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes;

(f) charges under transferable Service Contracts or permitted renewals or replacements thereof;

(g) permitted administrative charges, if any, on tenants security deposits;

(h) dues in any administration association, if any;

(I) insurance premiums on transferable insurance policies listed on a schedule herein or permitted renewals thereof

(if Including Expenses under §6.02, if any; must, [x] any other items listed in Schedule D.).

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes on the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

§12.02. If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority:

(a) first to the month preceding the month in which the Closing occurred;

(b) then to the month in which the Closing occurred;

(c) then to any month or months following the month in which the Closing occurred and

(d) then to the period prior to the month preceding the month in which the Closing occurred.

If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.

§12.03. If any tenants are required to pay percentage rent, escalation charges for real estate taxes, operating expenses, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing.

Section 13. Objections to Title, Failure of Seller or Purchaser to Perform and Vendee's Lien

§13.01. Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney upon receipt. Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to 60 days or until the expiration date of any written commitment of Purchaser's Institutional Lender delivered to Purchaser prior to the scheduled date of Closing, whichever occurs first, to remove any defects in or objections to title noted in such title report and any other defects or objections which may be disclosed on or prior to the Closing Date

§13.02. If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this contract or if Purchaser shall have any other grounds under this contract for refusing to consummate the purchase provided for herein, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey with a credit against the monies payable at the Closing equal to the reasonably estimated cost to cure the same (up to the Maximum Expense described below), but without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Purchaser may terminate this contract and the sole liability of Seller shall be to refund the Down payment to Purchaser and to reimburse Purchaser for the net cost of title examination, but not to exceed the net amount charged by Purchaser's title company therefor without issuance of a policy, and the net cost of updating the existing survey of the Premises or the net cost of a new survey if the Premises if there was no existing survey or the existing survey was not capable of being updated and a new survey was required by

Purchaser's Institutional Lender. Upon such refund and reimbursement, this contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. Seller shall not be required to bring any action or proceeding or to incur any expense in excess of the Maximum Expense specified in Schedule D (or if none is so specified, the Maximum Expense shall be one-half of one percent of the Purchase Price) to cure any title defect or to enable Seller otherwise to comply with the provisions of this contract, but the foregoing shall not permit Seller to refuse to pay off at the Closing, to the extent of the monies payable at the Closing, mortgages on the Premises, other than Existing Mortgage, of which Seller has actual knowledge.

§13.03 Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with §3.02. If Purchaser's title insurance company is willing to insure both Purchaser and Purchaser's Institutional Lender, if any, that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then, unless Purchaser's Institutional Lender reasonably refuses to accept such insurance in lieu of actual payment and discharge, Seller shall have the right in lieu of payment and discharge to deposit with the title insurance company such funds or assurances or to pay such special or additional premium as the title insurance company may require in order to so insure, in such case the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

§13.04. If Purchaser shall default in the performance of its obligation under this contract to purchase the Premises, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain.

§13.05. Purchaser shall have a vendee's lien against the Premises for the amount of the Downpayment, but such lien shall not continue after default by Purchaser under this contract.

Section 14. Broker

§14.01. If a broker is specified in Schedule D, Seller and Purchaser mutually represent and warrant that such broker is the only broker with whom they have dealt in connection with this contract and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to a claim a commission in connection with this transaction, unless otherwise indicated in Schedule D. The commission of such broker shall be paid pursuant to separate agreement by the party specified in Schedule D. If no broker is specified in Schedule D, the parties acknowledge that this contract was brought about by direct negotiation between Seller and Purchaser and that neither Seller nor Purchaser knows of any broker entitled to a commission in connection with this transaction. Unless otherwise provided in Schedule D, Seller and Purchaser shall indemnify and defend each other against any cross, claims or expenses, including attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this

paragraph shall survive the Closing or, if the Closing does not occur, the termination of this contract.

### Section 15. Notices

§15.01. All notices under this contract shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed as set forth in Schedule D, or as Seller or Purchaser shall otherwise have given notice as herein provided.

### Section 16. Limitations on Survival of Representations, Warranties, Covenants and other Obligations

§16.01. Except as otherwise provided in this contract, no representations, warranties, covenants or other obligations of Seller set forth in this contract shall survive the Closing, and no action base thereon shall be commenced after the Closing. The representations, warranties, covenants and other obligations of Seller set forth in §4.03, §6.01 and §6.02 shall survive until the Limitation Date specified in Schedule D (or if none is so specified, the Limitation Date shall be the date which is six months after the Closing Date), and no action based thereon shall be commenced after the Limitation Date.

§16.02 The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

### Section 17. Miscellaneous Provisions

§17.01. If consent of the Existing Mortgagee(s) is required under §2.03(b), Purchaser shall not assign this contract or its rights hereunder without the prior written consent of Seller. No permitted assignment of Purchaser's rights under this contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall

have been furnished with the name and address of the assignee. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

§17.02. This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein and all prior agreements, understandings, representations and statements, oral or written, are merged into this contract. Neither this contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§17.03. This contract shall be governed by, and construed in accordance with, the law of the State of New York.

§17.04. The captions in this contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

§17.05. This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§17.06. This contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

§17.07. As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§17.08. If the provisions of any schedule or rider to this contract are inconsistent with the provisions of this contract, the provisions of such schedule or rider shall prevail. Set forth in Schedule D is a list of any and all schedules and riders which are attached hereto but which are not listed in the Table of Contents.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Contract as of the date first above written.

SELLER(S):                                                BUYER(S):

BROOKLYN RENAISSANCE LLC                    MOSK Nominee LLC
DAUGHTERGREGORY

By: _____                              By: _____

Name: James McGown          Name: Kenneth Phorowitz
       PRINT                                      PRINT

Title: Managing Member      Title: Authorized Signatory

Receipt by Escrowee:
The undersigned Escrowee hereby acknowledges receipt of, by check subject to collection, to be held in escrow pursuant to §2.05.

By: _____ of Donnellan Waygarten Wine & Wiederkehr, LLP
Escrowee
Julie Curley, Partner

### Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

#### Lead Warning Statement

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

#### Seller's Disclosure

(a) *Presence* of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

   (i) |_____| Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

   _____

   (ii)|_____| Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) *Records* and reports available to the seller (check (i) or (ii) below):

   (i) |_____| Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

   _____

   (ii)|_____| Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

#### Purchaser's Acknowledgment (initial)

(c) _____ Purchaser has received copies of all information listed above.

(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead In Your Home.*

(e) *Purchaser* has (check (i) or (ii) below):

   (i) |_____| received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

   (ii)|_____| waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

#### Agent's Acknowledgment (initial)

(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

#### Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Seller | Date | Seller | Date |
| _____ | _____ | _____ | _____ |
| Purchaser | Date | Purchaser | Date |
| _____ | _____ | _____ | _____ |
| Agent | Date | Agent | Date |

### SCHEDULE A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Clinton Avenue, distant 301 feet 9-3/4 inches southerly from the corner formed by the intersection of the westerly side of Clinton Avenue and the southerly side of Park Avenue (old line); said point is also distant 209 feet 11-5/8 inches southerly from the new line of Park Avenue, as widened;

RUNNING THENCE westerly at right angles to Clinton Avenue and part of the distance through a party wall, 100 feet;

THENCE southerly parallel with Clinton Avenue, 20 feet;

THENCE easterly at right angles to Clinton Avenue and part of the distance through a party wall, 100 feet to the westerly side of Clinton Avenue;

THENCE northerly along the westerly side of Clinton Avenue, 20 feet to the point or place of BEGINNING.

RIDER TO CONTRACT OF SALE
BY AND BETWEEN
Brooklyn Renaissance, LLC
AS SELLER, AND
MGJR Nominee LLC or its assigns
AS PURCHASER

COVERING PREMISES KNOWN AS
84 Clinton Avenue, Brooklyn, NY

DATED: August *10*, 2015

This Rider shall be deemed to supplement and modify the printed form of Contract to which this Rider is annexed. Wherever there is any conflict between this Rider and the printed part of Contract, the provisions of this Rider are paramount and the Contract shall be construed accordingly. Hereafter, the term "Contract" or "Agreement" shall mean the printed form of Contract and this Rider.

1.    Bankruptcy Sale. The parties hereby acknowledge that the Seller is current a party to a Chapter 11 bankruptcy case pending in the Eastern District of New York, Case number 15-43122(cec) (the "Bankruptcy Case"). Notwithstanding anything to the contrary contained herein, pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Seller is conveying the Premises to the Purchaser, subject to higher and better offers, free and clear of all liens, mortgages, claims, rights, interests, charges and encumbrances on or affecting the Premises, if any exist, with such liens, mortgages, claims, rights, interests, charges and encumbrances, if any, to attach to the proceeds of sale to the same extent, priority, and validity and in the same amount as they existed as of the Closing Date, and subject to all claims and defenses of the Seller and its estate.

2.    Grantor's Title. Seller represents and warrants that an original Deed conveying the Property to Seller and all required transfer tax documents and other documents necessary to record the said Deed in the Office of the New York City Register, Kings County, will be delivered to a New York State licensed title insurance company located in New York for recordation prior to Closing.

3.    The Premises are sold subject also to the following:

(A)    Any and all covenants, restrictions and easements of record, if any, provided same do not prohibit the maintenance of the structure or structures now on the Premises, interfere with the ability to continue to use the Premises as the Premises has been historically used and same are not now violated;

(B)    Taxes and assessments (or installments thereof), which taxes, assessments, or payments are not yet due and payable on the Closing Date, subject, however, to Seller's obligations pursuant to Section 12.03 of this Contract;

(C)     Party wall agreement or agreements of record, if any, provided same are not presently violated;

(D)     Violations of building laws or regulations affecting the Premises issued by a City, State or Federal agency, provided that Seller shall pay all charges, penalties and fees arising from any such violations;

(E)     Standard and usual title company exceptions contained in the form of title policy or "marked-up" title commitment issued to Purchaser by its title company; and

(F)     Any financing statements, chattel mortgages and liens on personalty filed more than five (5) years prior to the Closing Date and not renewed or filed against property or equipment no longer located on the Premises, provided that Purchaser's title company will omit such matters from Purchaser's title policy at no additional cost or premium to Purchaser.

4.     The respective attorneys for the parties are hereby authorized (a) to give any notice which the party is required to give or may give under this Contract and (b) to agree to adjournments of closing. The parties agree that any changes or additions in the within Contract may be initialed by the respective attorneys for the parties with the same force and effect as if initialed by the parties.

5.     The Purchaser hereby agrees that it shall not record this Contract or any memorandum hereof. If the Purchaser shall violate the provisions of the proceeding sentence, this Contract, at Seller's option, shall become null and void, and all of the rights of the Purchaser hereunder shall thereupon cease and terminate and the Seller shall have the right to retain the contract deposit, as and for liquidated damages.

6.     Any and all notices required under this Contract shall be given by certified mail, return receipt requested, or sent overnight mail, or delivered in person, as follows:

To Seller:          Brooklyn Rennissance, LLC
                    320 Court Street, 3rd Floor
                    Brooklyn, New York 11231
                    Attention: James McGown

With a copy to:     DelBello Donnellan Weingarten Wise & Wiederkehr, LLP
                    One    North    Lexington    Avenue,    11th    Floor
                    White Plains, New York 10601
                    Attention: Erica Aisner, Esq.

To Purchaser: MGJR Nominee LLC
                    232 Broadway, Suite 400
                    Brooklyn, New York 11211

With copy to:        Kenneth <u>P.</u> Horowitz, Esq.
                       Kriss & Feuerstein LLP
                       360 Lexington Avenue, 12th Floor
                       New York, NY 10017

7.      The sale also includes all personal property, if any, owned by the Seller presently on the Premises, which is appurtenant to or used in the operation thereof, but the Seller makes no representation as to the quality, kind or condition thereof, and the Purchaser agrees to take the same "as is", and no part of the purchase price shall be deemed to be paid by the Purchaser for the same.

8.      If the Seller shall be unable to convey good and marketable title subject to and in accordance with this Contract, the sole obligation of the Seller shall be to refund Purchaser's downpayment made hereunder and to reimburse the Purchaser for the cost of title examination and survey. Upon the making of such refund and reimbursement, this Contract shall wholly cease and terminate and neither party shall have any further claims against the other by reason of this Contract, and Purchaser does hereby waive any right to commence an action for specific performance, and the lien, if any, of Purchaser against the Premises shall wholly cease. Seller shall not be required to bring any action or proceedings or otherwise incur any expense to render title to the Premises marketable, except to the extent specifically set forth in this Contract. Purchaser may, nevertheless, accept such title as the Seller may be able to convey, without reduction of the purchase price, and any credit or allowance against the same, and without any liability on the part of the Seller. The acceptance of a deed by Purchaser shall be deemed to be a full performance of and discharge of any and all agreements and obligations on the part of the Seller to be performed pursuant to the provisions of this Contract, except those, if any, which are herein specifically stated to survive delivery of the deed. The term "cost" of title examination is defined for the purpose of this Contract, is the expense actually incurred by Purchaser for title examination, in no event, however, to exceed the net amount which would be charged by a title company in the City of New York for title examination of the Premises, without issuance of policy, plus the cost to the Purchaser of any survey actually requisitioned, such cost not to exceed, however, the amount charged by such title company for a similar survey.

9.      If it appears from the objections or exceptions to title as set forth in Purchaser's title commitment that time will be required within which to remove the same, then and in that event, Seller shall have reasonable adjournment or adjournments of closing of title, from time to time, within which to clear such objections and/or exceptions. The Seller shall have the right to attempt to remedy any defects in title, and for such purpose, anything herein to the contrary notwithstanding, shall be entitled to one or more adjournments of closing for a period not to exceed ninety (90) days in the aggregate.

10.     The Purchaser agrees that no broker, consultant, finder or like agent or otherwise brought to the attention of Purchaser the premises herein or had any communication with Purchaser in regard to the same. The Seller agrees that it has not dealt with any broker, consultant, finder or like agent or otherwise who might be entitled to a commission or

compensation on account of introducing the parties hereto, the negotiation or execution of the Contract or the closing of the transactions contemplated hereby.

Each party agrees to indemnify, defend and hold harmless the other party from and against all claims, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees and disbursements) caused by or arising out of: (a) a breach of any of the aforesaid representations and warranties of the indemnifying party or (b) any claims for any brokerage or sales commissions, consultant's fees, finder's fees or any other similar fees or compensation of any person or entity claiming to have dealt with, on behalf of, through or under such indemnifying party.  The provisions of this Paragraph 10 of the Rider shall survive the Closing or the earlier termination of this Contract.

11.     If the payment made on account of the purchase price at the time of the execution of this Contract is by check, and if said check fails due collection, the Seller, at its option, may declare this Contract null, void and of no force and effect, and may pursue his remedies against the Purchaser upon said check or in any other manner permitted by law, such remedies being cumulative.

12.     If there be a purchase money mortgage executed on the closing of title by a corporation, then the Purchaser shall furnish satisfactory evidence of the due organization of said corporation and the payment of all franchise taxes which shall be a lien, up to the date of execution of said mortgage.

13.     Unpaid liens for taxes, water charges and assessments shall not be objections to title, but the amount thereof, plus interest and penalties thereon shall be deducted from the cash consideration to be paid hereunder, and allowed to the Purchaser subject to the provisions for apportionment of taxes and water charges contained herein.

14.     Seller will not remove any supplies or equipment on the Premises which are used in connection with the operation of the building.

15.     Any instrument or deposit in order to obviate a defect in marketability or to indicate the terms and reduced amount of any mortgage or other lien on the Premises, shall be in such form, conditions and amount as may be required by Purchaser's title insurance agent.

16.     The acceptance of a deed by the Purchaser herein shall be deemed full compliance by the Seller of all the terms, covenants and conditions of this Contract on the part of the Seller to be performed, except to the extent specifically set forth in the Contract, and no claims against the Seller shall survive the closing of title except as otherwise expressly stated herein.

17.     Seller shall not (a) settle any proceeding or proceedings for the reduction of the assessed valuation of the Premises for the tax year in which the Closing occurs without the prior written consent of Purchaser, which shall not be unreasonably withheld, or (b) reach settlement on any proceeding or proceedings with respect to any prior tax year if such settlement shall have any effect on the tax year in which the Closing occurs or any subsequent tax year, in any case without Purchaser's prior written consent, which consent, in the case only of the tax year during

which the Closing occurs, shall not be unreasonably withheld, but which may be withheld for any reason as to subsequent tax years. Any refunds due the Purchaser or Seller, as the case may be, shall be prorated less each party's proportionate share of legal fees and costs to recover the refund. Any settlements or proceeding for any years after the current fiscal year in which the Closing shall occur shall be solely for the benefit of the Purchaser. This paragraph shall survive the Closing. Notwithstanding anything to the contrary contained herein, following the Closing, if any tax proceedings are pending, Purchaser's counsel shall be substituted in place of Seller's counsel and Purchaser shall control the disposition of any such tax proceedings. The provisions of this Paragraph 17 shall survive the Closing.

18.    The Purchaser agrees that not later than seven (7) days after the date hereof a request for a title search will be placed for the Premises, together with such violation searches as Purchaser may desire. Such request for a search and insurance shall be placed with written instructions that Seller's counsel shall be given copies of all searches, thereto, surveys, survey readings and violations. Delivery of the title search to seller's attorney, including any updates or continuation reports or other written evidence of any title defect, shall constitute notice, if any, under the Contract of the title matters which are not Permitted Encumbrances as to which Purchaser objects. Any attempt by the Seller to cure an objection shall not be construed as an admission by the Seller that such objection is one which would give the purchaser the right to cancel this Contract.

19.    All sums required to be paid by Purchaser at the time of the closing of title (except for amounts up to $1,000.00) shall be by certified checks of the Purchaser or by official bank checks or teller's checks, drawn on a New York City bank or trust company, which is a member of the Federal Reserve System, or the New York City Clearing House, and shall be made payable directly to the order of the Seller, unless the Seller directs otherwise. Any such certified checks accepted by the Seller shall be deemed accepted subject to the collection thereof. No third party or endorsed checks shall be acceptable.

20.    No assignment by the Purchaser of this Contract or of any rights herein or hereunder shall be effective unless and until a duplicate original thereof and any assumption by the assignee of all of the Purchaser's obligations hereunder, both duly acknowledged, shall have been delivered to the Seller at least three (3) days before the date set for closing of title. Notwithstanding the foregoing, this Contract may not be assigned without the written consent of Seller except to an affiliate of Purchaser. Purchaser hereby advises and Seller hereby acknowledges that Purchaser intends to assign the Contract to an affiliate of Purchaser in accordance with this Paragraph 20.

21.    Submission by Seller of this Contract for review and execution by Purchaser shall confer no rights nor impose any obligations on either party until both Seller and Purchaser shall have executed this Contract and duplicate originals hereof shall have been delivered to the respective parties hereto.

22.    "Tax Free Exchange".

(a) The parties understand that the Seller may sell this property as part of

any IRS Section 1031 exchange, and the parties agree to cooperate in the execution of any documents required to effectuate this intent.

(b) The Seller will defend, indemnify and hold Purchaser herein harmless from any loss, liability, costs, fees, or expenses (including, without limitation, attorneys' fees) that may arise or result from the Seller's purchase of the "like-kind" exchange property.

(c) The Purchaser herein knows that the provisions of this paragraph are a major consideration for this transaction, and without which this Contract would not have been executed. Nothing herein contained, however, shall condition this Contract upon the designation by the Seller of property to be exchanged and the obligations of the Seller elsewhere herein shall remain in full force and effect, and, notwithstanding such failure to designate, the parties shall comply with their obligations under this Contract as if this paragraph did not exist.

22.   This in an "all-cash" transaction with no mortgage contingency.

23.   Certificate of Occupancy – Notwithstanding anything to the contrary contained herein, the Seller shall have no obligation to obtain a certificate of occupancy for the premises, and the Purchaser agrees to take the same as is and as used.

24.   CONDITION OF PREMISES.        Except as set forth in this Contract, the purchaser agrees to take the premises as is.

25.   Purchaser's obligation to close is conditioned on the Premises being delivered vacant of all occupants.

26.   Supplementing and modifying Section 4 of the Contract, Seller represents and warrants to the Purchaser on the date hereof and at Closing as follows:

   a. No party has a contractual right to purchase the Premises or any option to purchase the Premises or any right of first refusal or right of first offer to purchase the Premises.

   b. Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder.

   c. Seller is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any

dealings or transactions or be otherwise associated with such persons or entities.

d.   Seller has taken all necessary action to authorize the execution, delivery and performance of this Contract and has the power and authority to execute, deliver and perform this Contract and consummate the transaction contemplated hereby. The person signing this Contract on behalf of Seller is authorized to do so. Assuming this Contract has been duly authorized, executed and delivered by each of the other party(ies) to this Contract, this Contract and all obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this Contract, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

e.   The execution and delivery of this Contract and the performance of its obligations hereunder by Seller will not conflict with any provision of any law or regulation to which Seller is subject or any agreement or instrument to which Seller is a party or by which it is bound or any order or decree applicable to Seller or result in the creation or imposition of any lien on any of Seller's assets or property which would materially and adversely affect the ability of Seller to carry out the terms of this Contract. Seller has obtained or will obtain any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery or performance by Seller of this Contract.

f.   Except for pending the Bankruptcy Court proceeding, Seller has not received written notice of and has no knowledge of any action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Seller with respect to the Premises which if adversely determined could have a material adverse effect on the Premises or interfere with the consummation of the transaction contemplated by this Contract.

g.   Seller has not received any written notice from a governmental authority notifying Seller regarding the presence of hazardous contaminant at the Premises or a violation of any applicable law relating to a hazardous contaminant at the Premises, which remains unresolved, and Seller has no actual knowledge regarding the presence of any hazardous contaminant at the Premises which violate any applicable law.

h.   Seller has received no notice of and has no knowledge of any actual or proposed taking in condemnation of all or any part of the Premises.

i.   There are no employees at the Property and there are no service, employment, maintenance, supply, management, leasing, brokerage or other contracts affecting the Premises.

j. Between the date hereof and the closing (or the earlier termination of the Contract), Seller shall not lease or license any portion of the Premises or otherwise permit anyone to use or to occupy any portion of the Premises.

k. Seller holds free simple absolute title to the Premises.

l. The Premises are not the subject of any tax exemption or abatement.

The representations and warranties of Seller set forth in this Paragraph 26 and Section 4 of the Contract as restated as of the Closing shall survive the Closing for a period of 90 days. Additionally, the specific representations set forth in (j) of this Paragraph 26 shall survive the Closing and Seller shall be responsible for all monetary obligations and penalties associated with violations of the same.

27.    Supplementing and modifying Section 9 of the Contract, Seller covenants that between the date of this Contract and the Closing, the Seller will maintain in full force and effect until the Closing its present property insurance policies.

28.    Supplementing and modifying Section 10 of the Contract, at the Closing, Seller shall deliver the following to Purchaser:

        a. A FIRPTA Certification. Seller agrees to indemnify, defend and hold Purchaser harmless from and against any and all loss, costs and expenses that Purchaser may incur by reason of the imposition of a withholding tax and penalties related thereto resulting from the falsity, inaccuracy or incompleteness of Seller's FIRPTA Certification. This section shall survive Closing;

        b. A certificate of Seller confirming that the warranties and representations of Seller set forth in this Contract are true and complete on and as of the Closing (the statements made in such certificate shall be subject to the same limitations on survival as applicable to Seller's representations and warranties under Section 4;

        c. Any and all affidavits, undertakings, indemnities and other instruments and documents that Purchaser's title company shall reasonably require in order to insure title to Purchaser, subject to no exceptions other than the Permitted Exceptions; and

        d. Such evidence or documents as may be reasonably required by Purchaser's Title Company evidencing the status, good standing and capacity of Seller, and the authority of the person or persons who are executing the various documents on behalf of Seller in connection with Seller's sale of the Premises.

29.    Notwithstanding anything to the contrary in the Contract, Seller shall be responsible to pay at Closing (or to cause the title company to omit from the title report) all outstanding amounts arising out of all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued on or prior to the date of closing

by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises, including, without limitation, ECB, HPD and DOB amounts, boiler inspection fees and emergency repair liens; provided, however, that Seller shall not be obligated to remove any such notice of violation.

30.    If there is a mortgage affecting the Premises, Seller agrees to request and reasonably cooperate and assist the Purchaser in arranging for an assignment of such mortgage, without charge or cost to Seller, to Purchaser's lender.

31.    Seller, at Seller's sole cost and expense, shall be required to cure, remove or to cause to be removed of record at or prior to the Closing, as the case may be, the following: (i) the lien of any mortgage which encumbers the Premises as of the date of the Closing (other than any existing Mortgage if such is assigned and consolidated with any fee mortgage of the Purchaser); (ii) any liens which Seller places or is placed on the Premises, including mechanics liens, judgments and federal tax liens; (iii) any other liens or encumbrances against the Premises which were not caused by the acts of Purchaser and which can be cured by the payment of money or are in liquidated amounts; and (iv) any breach or anticipatory breach of any covenant, representation or warranty of the Seller.

32.    From and after the date hereof, the Seller will provide access from time to time, to all portions of the Premises as reasonably requested by Purchaser.

33.    The Downpayment shall be held by the Escrowee, in trust, in an IOLA account at M&T Bank.

34.    At Closing, Seller shall deliver to Purchaser a Bargain and Sale Deed with covenants against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed and acknowledged in proper form for recording so as to convey title to the Premises in accordance with the terms of the Contract.

35.    The Closing shall take place at the office of Seller's attorney.

36.    Seller hereby agrees to indemnify and hold harmless Purchaser from and against all and any fees, costs, claims and/or liability, including but not limited to reasonable attorney's fees that may accrue as a result of Seller's failure to file the New York City and/or New York State transfer taxes in connection with the conveyance of the Premises to Purchaser.

37.    This Contract may be executed in several counterparts, each of which is deemed an original, but all of which together constitute one and the same Contract. This Contract may be executed and delivered electronically with such signatures being deemed original signatures for purposes of enforcement and construction of this Contract. Any party delivering an executed Contract electronically shall also deliver an original executed Contract via overnight courier; provided, however, the failure of a party to deliver an original will not affect the ability of the other party to rely on an electronically executed and/or delivered Contract.

### 38. Bankruptcy Court Approval.

38.01   Sale Motion.  On or before ten (10) business days after execution and delivery of this Contract, Seller shall file with the Bankruptcy Court a motion ("Sale Motion") (including all supporting papers, proposed bidding procedures, and notices), reasonably satisfactory in form and substance to Purchaser, seeking entry of an Order (the "Bid Procedures Order") approving the Contract, subject to higher and better offers, and authorizing bidding procedures which, in the event of a competing bid by a Qualified Bidder (as defined below), shall culminate in an auction ("Auction"). The Bid Procedures Order shall further provide for a hearing whereat the Seller shall seek entry of an Order ("Sale Approval Order") confirming the results of the Auction or, in the event that no competing bids are received and the Auction is cancelled, to confirm that Purchaser is the successful bidder and therefore authorize the closing. On or as soon as practicable after the filing of the Sale Motion, the Seller shall use its best efforts to file a Chapter 11 plan and related Disclosure Statement, although such filing shall not be a condition of Closing.

38.02   Bid Procedures.  The Bid Procedures shall provide, among other things, that, in order to participate in the Auction, each prospective bidder must previously have delivered to Seller current financial statements of such person or other evidence of its financial wherewithal to consummate the purchase of the Property. Seller shall select those persons that, in Seller's reasonable business judgment, have demonstrated the necessary financial wherewithal and qualification to consummate the purchase of the Property (a "Qualified Bidder"). Purchaser shall constitute a Qualified Bidder for all purposes. Seller further agrees that the terms and conditions of the Auction, as proposed in the Sale Motion, shall require, inter alia, that the Qualified Bidder's offer to purchase the property (i) be upon the terms and conditions substantially similar to or better than those set forth in this contract (including, without limitation, by requiring the Qualified Bidder to deposit with the Escrow Agent on or prior to the date of the Auction, an amount equal to ten percent (10%) of its initial bid), (ii) not be conditioned on obtaining financing or the outcome of unperformed due diligence, (iii) not be conditioned upon the Bankruptcy Court's approval of any bid protections, such as break-up fees, termination fees, expense reimbursement, or similar type of payment, (iv) be accompanied by a copy of this contract marked to show any amendments and modifications thereto, and (v) as an initial overbid, be no less than One Hundred Twenty Five Thousand Dollars ($125,000) higher than the Purchase Price set forth in this contract (which amount consists of the Termination Fee (as defined below) and an initial overbid amount of Twenty Five Thousand Dollars ($25,000.00)), and that subsequent higher and better offers be in increments of not less than Twenty Five Thousand Dollars ($25,000). Seller shall also use its reasonable efforts to obtain any other approvals or consents from the Bankruptcy Court that may be reasonably necessary to consummate the transactions contemplated in this contract. In the event that a competing bid is approved by the Bankruptcy Court (an "Alternative Transaction"), then Seller shall, immediately and without further order of the Bankruptcy Court, (a) return Purchaser's Deposit and (b) pay, from closing proceeds from an Alternative Transaction, to Purchaser a sum equal to $100,000 (the "Termination Fee").

38.03   Closing.  The Closing shall be held within forty-five (45) days following the later to occur of (i) entry of a final and non-appealable Sale Approval Order or (ii) the entry of an

Order confirming the Debtor's Chapter 11 Plan. The Seller shall have the exclusive right, but not the obligation to close prior to confirmation of a Chapter 11 Plan provided that such election shall be no less than forty-five (45) days after entry of a final and non-appealable Sale Approval Order, unless the Seller and Purchaser agree, in a writing, to accelerate such closing date.

38.04 Purchaser agrees that it will take such actions as are reasonably requested by the Seller to assist in obtaining a Sale Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Contract and demonstrating that Purchaser is a "good faith" purchaser under § 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, the Seller shall use its reasonable efforts to defend such appeal.

38.05 Termination of Contract. Notwithstanding anything to the contrary herein, in the event that the Closing does not occur with One Hundred Eighty (180) days from the date of this Contract (the "Closing Deadline"), which event is not solely due to an act or omission of the Purchaser, Purchaser may elect, at any time after the Closing Deadline, to unilaterally terminate this Contract, by written notice to Seller's attorneys, and thereupon, the Escrowee shall immediately return the Purchaser's Contract Deposit to Purchaser (together with the interest thereon), and upon receipt of such funds, the parties shall have no further obligations to each other under the Contract.

39. Counterparts, etc. This Rider may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and either party hereto may execute this Rider by signing any such counterpart. The delivery of an executed counterpart of a signature page to this Rider by telecopier or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Rider.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Purchaser and Seller have duly executed this Rider as of the ___ day of August, 2015.

SELLER:

BROOKLYN RENAISSANCE, LLC

By: _____

Name: _James M 'Gow_

Title: _Managing Member_

PURCHASER:

MGJR NOMINEE LLC

By: _____

Name _Kenneth P Horowitz_

Title _Authorized Signatory_